TOWN OF HIGHLAND PARK v.
MARSHALL et ux.
No. 14253.

Court of Civil Appeals of Texas. Dallas.
Nov. 17, 1950.

Rehearing Denied Dec. 22, 1950.

J. C. Muse, Jr., Dallas, for appellant.

Alexander, George, Thuss, Johnson & Passman, and King S. Williamson, Dallas, for appellees.

YOUNG, Justice.

The action below was one to enforce zoning, brought by appellant municipality against Marshall and wife; being in nature of a petition for perpetual injunction, restraining defendants from renting and using as a second single family residence the accessory building on rear of their home premises at 3600 Harvard Street, located in a single family dwelling district. A violation of plaintiff's comprehensive zoning ordinance was charged, with prayer for issuance of temporary injunction pending trial to the merits. Defendants pled a nonconforming use, assertedly acquired prior to enactment of the Town Zoning Laws. By agreement, preliminary hearing was waived, the parties proceeding to final trial with the result of denial of all injunctive relief; petitioner duly prosecuting an appeal.

History of the subject matter in suit reaches back to 1924. Under the testimony of plaintiff's witness, Mrs. Rebecca McCanless, about that time the property, a corner lot at Harvard and Byron, was acquired by herself and former husband, H. F. McFarland. The family then consisted of two small children,—a boy and girl; also Mr. McFarland's mother, Mrs. Eleanor McFarland, a widow, who was considered a part of the family group. On the lot at time of purchase was a one-story six-room bungalow fronting on Harvard, with an accessory house on the rear adjacent to alley, facing Byron, and consisting of a one-story garage house, bedroom, living room, bath, and kitchen. The family car was always kept in this garage; Mrs. McCanless further stating that, although divorced from McFarland in 1935, she continued to live at 3600 Harvard until 1943; that in 1930 or '31 two bedrooms, bath, and storage room were built on rear of the main residence by a second-story addition; at the same time, having a need for more space in nature of bedroom, playground for children, etc., another story was added to the accessory house; that during all the years, her mother-in-law, the elder Mrs. McFarland, had lived and kept house in the accessory building, providing her own groceries, preparing own meals "whenever she wanted to"; paying all utility bills except water service, having her own income and being financially independent; however, that she was in and out of the main house as a member of the family, either for meals or assisting in care of the children during sickness or absence of parents; that the boy stayed with his grandmother a great deal, occupying the upstairs quarters; both children growing up and leaving home around 1939–40; that thereafter she continued to live in the main house, with the elder Mrs. McFarland in accessory house, until it was sold in 1943, the latter at no time paying any rent. Mrs. McCanless made contradictory statements as to having ever rented the accessory building, first testifying on cross-examination to a rental of upstairs room to two girls in 1935 or '36; then on redirect, that the back premises had never been occupied by any one except her mother-in-law with use by children as above described.

Lindsley Marshall, appellee, testified in substance that he bought the Harvard Street property in October 1948, paying

$17,000,—since adding $1,000 in improvements; that at time of purchase the garage building was furnished and occupied by Miss Mary K. Wise and three other girls on a rental basis, such arrangement existing on date of suit; that the rental included the garage space, though he used it jointly with tenants for storage purposes, parking his own cars on street; the accessory house having separate meters for utilities—except water; and that the garage house was in substantially the same condition as when he bought it. He had become familiar with both properties during the 20's, observing then that Mrs. McFarland lived in the garage building, carrying groceries into the place. In March 1949 he received a letter from one of plaintiff's officials advising that use of the rear house for rental purposes was in violation of ordinance. The upstairs quarters were 18½ by 30 feet in size.

Miss Mary Wise, Air Hostess, Braniff Air Lines, stated that she had been renting the building on rear of the Marshall lot, known as 5013 Byron, since April 1948, sharing the space with three others,—two upstairs and two down, cooking meals and keeping house there; that there was a porch, concrete step and slab, giving access to Byron Street, with similar construction on side facing the main house on Harvard.

In July 1930, H. F. McFarland sought and obtained from appellant's building inspector a permit for alteration of his residence at 3600 Harvard, no like application appearing to have been made for the described addition to garage building.

Appellant's ordinance of comprehensive zoning dates from July 1929; and section 2 defines certain words used generally therein, from which is quoted: " * * * (2) Accessory Building: A subordinate building, the use of which is manifestly incidental to the permitted use actually made of the main building, or to the permitted use actually made of the premises. * * * (12) Dwelling, Single Family: A detached building having accommodations for and used and occupied exclusively by only one family, and neither used nor adaptable to use for any other purpose.

* * * (14) Family: One or more individuals living together as a single housekeeping unit, as distinguished from a group occupying a boarding house, lodging house, fraternity house, or hotel. * * * (26) Nonconforming Uses: Any building or land lawfully occupied by a use at the time of passage of this ordinance or amendments thereto which does not conform, after the passage of this ordinance or amendments thereto, with the use regulations of the district in which it is situated. (27) Occupancy: Occupancy, as used in this ordinance, pertains to, and is, the purpose for which a building is used or intended to be used. Change of occupancy is not intended to include change of tenants or proprietors. * * *." Section 3 relates to a single family dwelling district, providing in part: "A. Use Regulations: In a Single Family Dwelling District a building, premises or lot shall be used for the following, but only for the following purposes, and every building erected or structurally altered shall be designed and arranged to be used, and thereby made adaptable to use, for only the following purposes: (1) Single family dwelling; (then follow a number of purposes not material); * * *; and, (8) Such accessory or subordinate uses as naturally appertain thereto and customarily follow as a mere incident to the use and enjoyment of premises and buildings for any of the above uses permitted by this Section and actually made of the premises, * * * B. Accessory Buildings: The following, but only the following, shall be permitted as accessory buildings: (Paragraphs 1 and 2 relate to restrictions not material) * * * (3) Nothing herein shall authorize or be construed to permit the occupancy or use of any accessory building as a place of abode or dwelling by anyone other than a bona fide servant actually then regularly employed by the occupant of the main structure on such premises. The equipment of an accessory building or servants' quarters with sink, cook stove, or any other facilities for the independent occupancy thereof, shall be prima facie evidence that such building or servants quarters is not an accessory building but

itself a second single family dwelling in violation of this Section. * * * Section 7. Nonconforming Uses: (1) Any use of property existing at the time of the passage of this Ordinance that does not conform to the regulations prescribed in the preceding sections of this Ordinance, shall be deemed a nonconforming use. (2) A nonconforming use may be continued subject to such regulations as to the maintenance of the premises and conditions of operation as may in the judgment of the Board of Adjustment be reasonably required for the protection of adjacent property. (3) A nonconforming use shall not be extended, but the extension of a use to any portion of a building which portion was arranged or designed for such nonconforming use at the time of the passage of this Ordinance shall not be deemed the extension of a nonconforming use. (4) A nonconforming use shall not be changed unless changed to a conforming use. * *." Findings of fact and conclusions of law were filed by the trial court,—beyond the time, however, provided by Rule 297, Texas Rules of Civil Procedure.

Appellant's points of error will be summarized, viz.: (1) No evidence or insufficient evidence to sustain the judgment; (2) trial court's error as a matter of law in holding that occupancy of the accessory building, on or prior to effective date of zoning, by Mrs. Eleanor McFarland, mother of H. F. McFarland, owner and occupant of the main dwelling at 3600 Harvard Street, situated in a single family dwelling district, with relationship between the parties not that of landlord and tenant, brought into being a nonconforming use which could be asserted by appellees (purchasers of the property in 1948), inclusive of a right to permit occupancy of said accessory building by outside parties on a rental basis and as a second single family residence; (3) error in denying injunctive relief, the undisputed evidence showing that on or about July 21, 1930, material alterations were made in the accessory building by the owner at 3600 Harvard Street without a building permit or certificate of occupancy as required by appellant's zoning ordinance, whereby the non-

conforming use relied on by appellees was lost; (4) under express provisions of the zoning ordinance, an accessory building is defined to be a subordinate building, the use of which is manifestly incidental to the permitted use actually made of the main dwelling or to the permitted use actually made of the premises; and the trial court erred in holding that the manner of use by the mother and children of Mr. McFarland, owner and occupant of the main dwelling, created a nonconforming use, thereby legalizing a use of such accessory building as a second single family dwelling on a lot restricted to one single family residence; (5) undisputedly, the nonconforming use, if any, had been abandoned; (6) the court's findings of fact and conclusions of law, belatedly filed, and not in compliance with Rule 297, Texas Procedure, should be disregarded.

"* * * A nonconforming use of land or buildings entitled to protection against a zoning restriction is one that existed and was lawful when the restriction became effective and which has continued to exist since that time. * * *." Sec. 25.185, p. 369, McQuillin, Municipal Corporations, 3rd Ed., Vol. 8. First and foremost, it is appellant's contention that from express provisions of sec. 3-A, subdvs. 1 and 8, occupancy of the garage building by Mrs. Eleanor McFarland, gratuitously and as a member of the family, prior to zoning, did not constitute a nonconforming use, being at all times consistent with the ordinance; in other words, a use incidental to the permitted use actually made of the main dwelling and naturally appertaining thereto. But the cited provisions of the ordinance must be considered in connection with section 3-B, subdv. 4, Accessory Buildings, reading: "(3) Nothing herein shall authorize or be construed to permit the occupancy or use of any accessory building *as a place of abode* or dwelling by anyone other than a bona fide servant actually then regularly employed by the occupant of the main structure on such premises. The equipment of an accessory building or servants quarters with sink, cook stove, or any other facilities for the independent occupancy thereof, shall be-

prima facie evidence that such building or servants quarters is not an accessory building but itself a *second single family dwelling* in violation of this Section." (Emphasis ours.)

█ Use of an accessory building as a place of abode under the foregoing proviso would appear confined to bona fide servants employed by the main occupant of the premises, servants, in law, being members of the family, Wilson v. Cochran, 31 Tex. 677, 678, 95 Am.Dec. 553; but precluded from making use of their quarters for independent occupancy, i. e., kitchen and other facilities for preparation of meals. Be that as it may, it is obvious without a general rehash of above record testimony that the trial court was fully warranted in finding that, from its inception, the use by Mrs. McFarland of the garage building was independent of the main residence, making of it a second single family dwelling, and, at the onset of zoning in 1929, becoming a nonconforming use. The direct testimony of Mrs. McCanless is sufficient, we think, to raise the issue of such independent occupancy. Referring to aforesaid garage premises, this witness said:

"Q. Did some member of your family live in there? A. Yes, my husband's mother * * * Mrs. McFarland.

"Q. Did she keep house out there alone? A. Yes." Again speaking of the garage building, she stated:

"Q. The children, when they grew up, were the only ones that occupied or used the upstairs? A. In the garage, yes.

"Q. And when they left, your mother-in-law—A. She was there alone.

"Q. Can you give any kind of approximation or estimate how much time she spent with you in the main house? A. No, she wasn't there any at all, unless there was sickness and she would be in and out for meals a great deal.

"Q. But she felt independent and had independence by having a place for herself? A. Yes, she did." And here it is to be observed that the elder Mrs. McFarland, a widow, constituted a "family" as "one or more individuals living together as a single housekeeping unit * * *,"

within meaning of the ordinance, sec. 2, paragraph 14.

█ Manifestly, in the same connection, appellant relies on sec. 2, paragraph 2, defining accessory building, and sec. 3-A, paragraph 8, relating to subordinate uses, single family dwellings, as demonstrating that the occupancy of the garage property by Mrs. McFarland was permissible thereunder and hence never a nonconforming use. The cited provisions are generally worded, and to the extent that same may be in conflict with the requirements of above emphasized portions of Subdv. B (sec. 3, accessory buildings, single family dwellings), the latter will be deemed controlling. A general rule of construction, applicable alike to statutes and ordinances, is that: "In case of conflict between a general provision and a special provision dealing with the same subject, the former is controlled or limited by the latter; and this is so whether the provisions in question are contained in the same act or in different enactments. In other words, when a statute makes a general provision apparently for all cases and a special provision for a particular case or class, the former yields and the latter prevails in so far as the particular case or class is concerned. * * *." 39 Tex.Jur., sec. 114, p. 212.

█ If we be correct in the conclusion that the principal use made of this garage building by Mrs. Eleanor McFarland prior to zoning comprehended the essential elements of a second single family dwelling, then it became immaterial that such occupancy was gratuitously held. It was the use made of the property that resulted in the existing nonconformity, irrespective of the consideration therefor, whether on a rental basis or otherwise.

█ It is contended that the nonconforming use, at most would be limited to the garage building as it existed prior to 1929; not legally extending to the structural alterations thereof made in 1930 without a permit; with result that any occupancy of the subsequently added second story was wholly unauthorized. While appellees acquired this property in 1948 subject to the

664

Town zoning laws applicable thereto, the record reflects no knowledge by them that the accessory building enlargement, when made, was in violation of ordinance. Nor do we think they were lawfully chargeable with notice under the circumstances here of what the building inspector's record reflected or failed to reflect with reference to a permit. On the other hand, would not the completed structure stand as mute evidence of acquiescence on part of Highland Park officials concerning alterations made 18 years before? The presumption would obtain after such lapse of time that aforesaid extension was consistent with ordinance, not that there was a violation; in other words, an alteration within purview of sec. 7, paragraph 3, providing that the extension of a use to any portion of a building, which portion was arranged or designed for such nonconforming use at the time of passage of the ordinance, should not be deemed the extension of a nonconforming use.

In absence of testimony to the contrary, it is always to be inferred that parties have acted within the scope of their legitimate authority, and it will never be presumed that they have violated the law when the reverse is equally consistent with the facts disclosed. Williams v. Talbot, 27 Tex. 159; 17 Tex.Jur., sec. 59, pp. 267, 268. Appellees' counterpoint No. 2 therefore correctly states that appellant City having acquiesced in the enlargement of the garage building " * * * for more than nineteen years cannot now be heard to complain that defendants, innocent purchasers for value, have no right to maintain said single family dwelling structure in its present condition."

Appellant urges abandonment of any nonconforming use as a matter of law prior to Marshall's purchase. Following sale of the Harvard Street property by Mrs. McCanless in 1943, there were several intervening owners, Mrs. Vivian Pope selling to appellees in October 1948 as already shown. What particular use was made of the garage premises during the interim does not appear; Mr. Marshall stating, in such connection, that Miss Wise "was living there when I bought it, and that is the reason I bought it." The record testimony implies no more than a cessation of the nonconforming use for a period of time, being in no sense conclusive of abandonment. " * * * the discontinuance of a nonconforming use results from the concurrence of the intent to abandon and some overt act or failure to act which carries the implication of abandonment. The mere cessation of the use for a reasonable period does not of itself work an abandonment, whether the building is permitted to remain vacant or is temporarily devoted to a conforming use with intent that the nonconforming use be resumed when opportunity therefor should arise, and periods of interruption due to lack of demand, inability to get a tenant, and financial difficulty do not change the character of use." 62 C.J.S., Municipal Corporations, § 226, p. 503; Rosenthal v. City of Dallas, Tex.Civ.App., 211 S.W.2d 279.

Our conclusions here reached are based on the statement of facts, for which reason the court's findings and conclusions have not been regarded as controlling. This renders unnecessary a discussion of point 9, seeking a reversal because the court's findings and conclusions were filed beyond the time prescribed by Rule 297, Civil Procedure. Moreover, no prejudice appears to have resulted from the court's manner of handling the proceedings in question, thereby rendering harmless the error complained of. Wagner v. Riske, 142 Tex. 337, 178 S.W.2d 117; Bostwick v. Bucklin, 144 Tex. 375, 190 S.W.2d 818.

The judgment under review is in all respects affirmed.