**Paul WIECK, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

No. 10639.

District of Columbia Court of Appeals.

Argued May 12, 1977.

Decided Feb. 1, 1978.

Harley J. Daniels, Washington, D. C., with whom R. Robert Linowes, Washington, D. C., was on the brief, for petitioner.

S. Perry Jones, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Before KERN, GALLAGHER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This is a petition for review of an order of the Board of Zoning Adjustment (BZA) denying an appeal from a decision of the Chief of the Zoning Inspection Branch.[1] That decision, if upheld and enforced, would require petitioner to remove from a backyard structure—which has been and is now used as a residential rental property—those plumbing and electrical items which render the building suitable for human habitation. The building concededly does not comply with the applicable zoning regulation, but petitioner argues that the BZA erred in not finding the District of Columbia government (District) estopped from enforcing that regulation with respect to his property. The peculiar facts of this case are crucial to our decision and thus are recounted in detail.

In June of 1967, a building permit was issued to petitioner's predecessor in interest, Cecile deRochefort, for the erection of an accessory structure—a shed for the storage of garden tools—at 3267 P Street, N.W. The shed was completed in October of that same year. The shed was built with aluminum siding and the value of the work set at $1,200.

The following month, on November 15, a second building permit was issued to Mrs. deRochefort for the stated purpose of repair, authorizing the construction of a new fireplace, partitions for a new bathroom, and some electrical wiring work—the stated value of which was $260. The application for this permit stated the present use of the building as "Priv. Home" and the issued permit recites the occupational use as a dwelling. The drawing accompanying the application describes the work as being done to the "recreation room". The work

---

1. The petition is before us pursuant to D.C. Code 1973, § 11–722.

described in the permit was done to the backyard structure which had been erected under the authority of the first permit issued to Mrs. deRochefort. Twice before work had commenced on the structure and at least twice during work on it, an inspector visited the site.

Several months after completion of the work described in the second permit, the Zoning Administrator sent a letter dated July 2, 1968, to Mrs. deRochefort informing her that the second permit had been issued erroneously due to a misstatement of fact in the permit application—*i. e.*, that the present use of the building was as a private home. Furthermore, the letter ordered her "to remove those items of a plumbing and electrical nature which by their presence make the structure suitable for human habitation and discontinue use of the structure for human habitation." This order was based on her purported violation of a zoning regulation[2] in using the structure as a dwelling.

After this order with its threat of enforcement, no other action on the part of the zoning authorities occurred until three years later in February 1971, at which time a letter almost identical to that of July 2, 1968, was sent to her. Again, despite this warning of potential penalties, no further enforcement action was taken. Under unclear circumstances, however, an inspector noted on July 12, 1971, that the "bldg. in question is now used as a tool shed only."[3]

Petitioner purchased the property at 3267 P Street, N.W., in May 1974. On December 2, 1974, the Chief of the Zoning Inspection Branch sent a notice to petitioner advising him of the zoning violation and ordering him to dismantle the offensive structure, reverting its use to a tool shed in accordance with the first permit. Mr. Wieck appealed to the BZA from that order. At the BZA hearing, petitioner's counsel argued that the zoning officials were estopped from enforcing the zoning regulation violated by the backyard structure. In denying the appeal, the BZA declined to rule on the estoppel issue asserting that sufficient material facts—particularly the testimony of Mrs. deRochefort, whom the BZA had no authority to subpoena—were not introduced to enable it to weigh the equities of the parties involved.

The applicable standard of review is set out in D.C.Code 1973, § 1–1510. *See* § 11–722; *Hubbard v. District of Columbia Board of Zoning Adjustment,* D.C.App., 366 A.2d 427 (1976). Thus, this court has the power

> (3) to hold unlawful and set aside any action or findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . or (E) unsupported by substantial evidence in the record of the proceedings before the court. [§ 1–1510(3).]

Our duty on review of this BZA order is "[to] determine whether findings made 'are supported by and in accordance with reliable, probative, and substantial evidence in

---

2. The zoning regulation which was found to be violated by a habitable structure in the backyard is D.C. Zoning Reg. § 7601.3:

> An accessory building in any district shall not exceed one-story or 15 feet in height except in an R–1–A or R–1–B district an accessory private garage may have a second story used for sleeping or living quarters of domestic employees of the family occupying the main building. Any such two-story accessory building shall not exceed 20 feet in height and shall not be located within the required rear yard. Any such two-story accessory building shall also be set back from all side lot lines for a distance equal to the minimum width of a required side yard in the district in which it is located.

3. The record does not reveal how the inspector obtained this information—although presumably from an on-site inspection—nor whether the statement referred to another validly existing tool shed on the property, rather than the rental property. Even assuming the statement does refer to the offending building, there is no indication that Mrs. deRochefort had complied with the order. The order required the removal of certain plumbing and electrical items which render the building suitable for human habitation, not just that its use be reverted to a tool shed. Furthermore, there is other evidence in the record which shows that the building had been used as a residential rental unit continuously from its illegal conversion through the date of Mr. Wieck's purchase.

the whole administrative record, *Schiffmann v. ABC Board*, D.C.App., 302 A.2d 235 (1973), and whether the conclusions of the Board flow rationally from these findings, *Stewart v. BZA*, D.C.App., 305 A.2d 516 (1973).' *Marjorie Webster Junior College, Inc. v. BZA*, D.C.App., 309 A.2d 314, 319 (1973)." *Dietrich v. District of Columbia Board of Zoning Adjustment*, D.C.App., 320 A.2d 282, 285 (1974).

The BZA concluded, on the basis of its findings and the record, that the estoppel "issue raised by . . . [petitioner] is not supported by sufficient facts to enable the Board to decide that issue." The Board then stated vaguely that such an issue must be "decided by weighing the equities of the parties involved, based upon a factual determination by the Board as to the actions of those parties." In deciding not to rule on the asserted estoppel, the BZA relied principally upon its failure to determine why the second permit was issued.[4] The BZA erred, however, as there is sufficient evidence in the record to rule on petitioner's estoppel argument.

Due to the important general public interest in the integrity and enforcement of zoning regulations, the affirmative defenses of estoppel and laches are not judicially favored. *See, e. g., Nathanson v. District of Columbia Board of Zoning Adjustment*, D.C.App., 289 A.2d 881, 884 (1972); *People v. County of Kern*, 39 Cal.App.3d 830, 115 Cal.Rptr. 67 (Dist.Ct.App.1974). Furthermore, as stated in *District of Columbia v. Stewart*, D.C.App., 278 A.2d 117, 119 (1971):

> While estoppel may be applied to the District of Columbia in certain limited situations when the equities are strongly in favor of the party invoking the doctrine (*District of Columbia v. Cahill*, 60 App.D.C. 342, 54 F.2d 453 (1931), cited in footnote], the District of Columbia must first have authority to act before conduct of its employees can be the basis of an estoppel defense. *National Hospital Service Society, Inc. v. Jordan*, 76 U.S.App. D.C. 26, 128 F.2d 460, cert. denied, 317 U.S. 664, 63 S.Ct. 65, 87 L.Ed. 534 . . . (1942). [Footnote omitted.]

The Board argued here that the zoning officials had no authority to issue the second permit,[5] and that, therefore, under *District of Columbia v. Stewart, supra*, and *National Hospital Service Society, Inc. v. Jordan, supra*, the petitioner is barred from asserting estoppel.[6] In the leading case of

---

**4.** The BZA's findings contain at least one apparent inconsistency. Finding No. 8 states that "[i]t is not clear what transpired during the permit issuing process which allowed the facilities in question to be installed." Finding No. 12 states "[t]he reason as to why permit No. B–163502 was issued allowing the conversion of the accessory building into habitable space is not clearly set out in the record of this case." In contrast, Finding No. 5 states "[t]he record indicates that the permit which allowed the installation of the facilities in question was issued by mistake or misrepresentation." This court can only speculate as to the meaning of the BZA's inconsistency. Perhaps we are expected to assume the evidence is unclear only as to whether the permit was issued by mistake or by misrepresentation, as opposed to any other reason. We are not required to resolve this problem, since a determination of that fact would bear on a consideration of estoppel only with respect to petitioner's predecessor in interest, Mrs. deRochefort.

**5.** D.C. Zoning Reg. § 8103.1 provides that (except in limited situations not applicable here) building permits "shall not be issued for the proposed . . . [work on] any *structure*

unless such *structure* complies with the provisions of these regulations." Thus, the respondent argues that the zoning officials had no authority to issue the second building permit which concededly does not comply with the zoning regulations.

**6.** In *Coffin v. District of Columbia*, D.C.App., 320 A.2d 301, 305 (1974), this court summarized when estoppel was available against the District, in light of *District of Columbia v. Stewart, supra; National Hospital Service Society, Inc. v. Jordan, supra;* and *District of Columbia v. Cahill*, 60 App.D.C. 342, 54 F.2d 453 (1931):

> [A]s a result of conduct by its employees, estoppel may be applied against the District provided it has underlying authority to act in the specific area and the equities are strongly in favor of the party invoking the doctrine.

There the court did not first decide the issue of authority and then proceed to a discussion of the equitable factors, but instead lumped the factors bearing on authority with the equitable considerations—never specifically deciding whether the official's act was unauthorized or just defectively exercised authority. *Coffin, supra* at 305.

*District of Columbia v. Cahill,* 60 App.D.C. 342, 54 F.2d 453 (1931), where estoppel was applied in a zoning suit, the court did not specifically consider the issue of the official's authority as bearing on the application of the doctrine against the District, but focused on the particular elements of estoppel and particularly on the relative equities of the two parties. We do not reach this issue,[7] however, since we find that petitioner has not conclusively proved all the elements of equitable estoppel.

The petitioner relies primarily on *Cahill* to establish estoppel. The necessary elements are: a party (1) acting in good faith, (2) on affirmative acts of a municipal corporation, (3) makes expensive and permanent improvements in reliance thereon, and (4) the equities strongly favor the party invoking the doctrine. *See, e. g., Cahill, supra* at 344, 54 F.2d at 454–55. Furthermore, the reliance of the party must be justifiable. *Nathanson v. District of Columbia Board of Zoning Adjustment, supra* at 884.

The record does not demonstrate petitioner's justifiable reliance on any affirmative acts of District zoning officials. Petitioner does not point to anything the zoning officials did upon which he relied to his detriment nor does the record disclose any reliance-provoking conduct. There is no evidence which indicates that petitioner knew of, much less relied upon, the issuance of the second permit. Rather, his reliance resulted from the inaction of the zoning officials—the failure to enforce their two prior orders of 1968 and 1971. A failure to act is not equivalent to an affirmative act. Moreover, inaction ordinarily is not sufficient to raise an estoppel. *See City of Evanston v. Robbins,* 117 Ill.App.2d 278, 254 N.E.2d 536 (1970); *Rye Beach Village District v. Beaudoin,* 114 N.H. 1, 315 A.2d 181 (1974); *Salt*

*Lake County v. Kartchner,* 552 P.2d 136 (Utah 1976).[8]

Our inquiry has not ended, however, until we consider the application of laches to this situation. Although not specifically pleaded as a defense to enforcement before the BZA or before this court, the substance of a laches defense is apparent from the petitioner's equitable arguments—particularly those focusing on the longlasting failure of the proper officials to enforce their previous orders and the consequent prejudice to petitioner from their present attempted enforcement.

"Laches is a species of estoppel, being defined as the omission to assert a right for an unreasonable and unsatisfactorily explained length of time under circumstances prejudicial to the party asserting laches." 3 Rathkopf, Law of Zoning and Planning, at 67–1 (3d ed. 1972). It is often claimed "where the inactivity of the officials charged with the enforcement of the ordinance has misled the owner into acts in violation of the ordinance . . . or has misled persons into purchasing the property in ignorance of the illegality of the use or structure." *Id.* at 67–2. As previously stated, a claim of laches in the zoning context is not judicially favored and is rarely applied "except in the clearest and most compelling circumstances[,]" *Moore v. Bridgewater Township,* 69 N.J.Super. 1, 173 A.2d 430 (App.Div.1961). Where a party can prove inexcusable delay which has resulted in substantial prejudice, however, laches may be found. *Amidon v. Amidon,* D.C.App., 280 A.2d 82, 84 (1971).

Here, the first enforcement order was sent to Mrs. deRochefort in July of 1968, the second order was sent to her in February of 1971, and the third order was sent to petitioner in December of 1974—amounting

---

7. Even if we were to reach this issue, on the record before us we would consider the issuance of the second permit as mistakenly exercised authority by the zoning officials rather than as an act wholly beyond the scope of their underlying authority. *See Coffin v. District of Columbia, supra* at 305. To find a lack of authority here would virtually abolish the doctrine of equitable estoppel as applied to the government, since any invalid official action could be characterized as unauthorized.

8. *But see City of Chicago v. Exchange National Bank,* 51 Ill.2d 543, 283 N.E.2d 878 (1972), in which it was suggested that, if the city knew of the violation of the zoning ordinance by the vendor of a building, the vendee could rely on an estoppel defense.

to a delay of almost six and one-half years. The record does not disclose any sufficient reasons for this delay.

If, at any time prior to May of 1974, when petitioner bought the P Street property, the zoning officials had followed up on the two prior enforcement orders, the petitioner might not have purchased the property, or if he had, he would not have done so in reliance on the presence of a valuable rental dwelling in the backyard. The petitioner purchased the property for $165,000 and presented some evidence that the offending building was an asset worth approximately $25,000. The BZA, however, found that petitioner failed to present "the precise measure of injury in dollars and cents which would result from his having to remove the facilities in question." Although petitioner did not present evidence of the "precise measure of injury" in that he did not demonstrate how much the actual removal of the facilities would cost, we believe petitioner's showing of injury—from the loss of an income-producing property, the value of which was indubitably reflected in his purchase price—to be sufficient to find substantial prejudice[9] to him as a result of the zoning officials' inexcusable delay.

In re Heidorn's Appeal, 412 Pa. 570, 195 A.2d 349 (1963)[10] is of interest. There, the Heidorns purchased a house in 1953, which had violated a 1942 local zoning ordinance ever since it had been built in 1950. A stone stoop and wooden overhang projected from the front door of the house in violation of an ordinance which imposed a 25 foot setback requirement. A similarly restrictive ordinance was enacted in 1958. In 1959 the Heidorns replaced the stoop and overhang with an aluminum awning which was about 12 feet wider and projected 3½ more feet towards the front street. Shortly thereafter the municipal officials informed the Heidorns that their awning encroached on the setback territory. The Pennsylvania Supreme Court affirmed the lower court's holding "that since the Township had allowed approximately 10 years to pass without objecting to the ordinance violation, it was guilty of laches and could not now sustain a violation on the basis of the original ordinance of 1942." (Footnote omitted.) In re Heidorn's Appeal, supra, 195 A.2d at 351. The court dismissed as unwarranted the Township's concern over the precedential value of this case as affecting setback violations.

As the Pennsylvania Supreme Court stated in In re Heidorn's Appeal, supra, 195 A.2d at 351:

> While courts are reluctant, and should be, to impose the sanction of laches on governmental divisions, equity cannot close its eyes to the sloth, indifference or official neglect of a municipal body any more than it can to the neglect of an individual where such neglect harms an innocent person.

Here the delay involved was six and one-half years and it was inexcusable since neither of the prior enforcement orders were actually pursued, let alone diligently pursued, and for no sufficiently demonstrated reasons. The substantial prejudice which would be imposed on petitioner, the new property owner, if enforcement were now upheld, involves the partial dismantling of a building which provides him with rental income, and for which he doubtless made a sizeable capital investment included in the purchase price for the P Street property. Any conceivable harm to the general public interest from not enforcing the zoning regulation in this case is not sufficient to outweigh the inequity of substantial prejudice to petitioner. Under these extraordinary and compelling circumstances, and with actual notice by the government being present for such a long period, we reverse

9. In Cahill, supra, the estimated potential loss was at least $6,135.

10. Cf. Westfield v. City of Chicago, 26 Ill.2d 526, 187 N.E.2d 208 (1963); Town of Highland Park v. Marshall, 235 S.W.2d 658 (Tex.Civ.App. 1950). But see Haba v. Cuff, Ohio App., 28 Ohio Op.2d 266, 201 N.E.2d 343 (1963), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 558, rehearing denied, 380 U.S. 927, 85 S.Ct. 883, 13 L.Ed.2d 815 (1965); City of Fort Worth v. Johnson, 388 S.W.2d 400 (Tex.1964).

the decision of the BZA as not being in accordance with law and hold that the District is barred from enforcing the applicable zoning regulation against petitioner due to laches. In zoning, as in other areas of the law, the government *can* be in the wrong. In zoning, the equities *can* be so compelling as to favor the individual property owner. Accordingly, the BZA order upholding the enforcement order of the Chief of the Zoning Inspection Branch is vacated and the cause remanded for disposition consistent with this opinion.

*So ordered.*

MACK, Associate Judge, dissenting:

The majority has found, as indeed it must, that the illegal use of petitioner's building for residential purposes cannot be justified on a theory of estoppel. It seems to me incongruous, then, that the majority should sua sponte invoke laches to permit that same violation.

The majority recognizes that "[d]ue to the important general public interest in the integrity and enforcement of zoning regulations, the affirmative defenses of estoppel and laches are not judicially favored." *Ante* at 10. This is undoubtedly correct, for the general rule is that neither of these defenses is ever available against a municipality.

More specifically, it is hornbook law that even though a zoning authority issues a permit, and a landowner proves he relied thereon, if that permit was issued in violation of the zoning ordinances, the city can revoke the permit and enforce the ordinances. 8 E. McQuillin, Municipal Corporations § 25.153 (3d rev. ed. 1976); 1 R. Anderson, American Law of Zoning § 6.13 (1968); 3 Rathkopf, Law of Zoning and Planning at 67–5 (3d ed. 1972). The policy considerations underlying this harsh rule are fully applicable to the instant case. Those considerations are:

(1) Lack of authority on the part of the administrative officer to issue a per-

mit other than in strict accordance with the terms of the ordinance;

(2) The general public interest in the protection of the zoning ordinance which transcends the harm to the permittee;

(3) The actual or constructive knowledge of recipient of the permit of the illegality of its issuance; . . .

(4) The inability of an official to grant exemptions to the provisions of the ordinance; [and]

(5) . . . [T]he issuance of a permit contrary to the provisions of the ordinance may be the result of fraud on the part of the applicant with concurring negligence or ignorance on the part of the official, or the result of a corrupt bargain. [3 Rathkopf, Law of Zoning and Planning, *supra* at 67–5 to 67–6, 67–8 (footnotes omitted).]

Moreover, if there are strong public policy reasons for not allowing estoppel as a defense to the enforcement of municipal ordinances, there are even stronger reasons for not allowing laches as a defense. For, where estoppel is invoked, a municipality has taken an affirmative action which misled someone. Where laches is involved, however, the only fault of the city is inactivity. Furthermore, such inactivity is not necessarily "wrong," as the majority suggests. It could result from an entirely justifiable decision to utilize scarce enforcement resources for more important matters.[1]

In any event, the inactivity in the instant case—at most six years, and in my view of the facts, three years—is hardly wrongdoing of a sufficiently serious nature to warrant the drastic remedy of nonenforcement of the law. Indeed, the courts have, virtually without exception, refused to apply the doctrine of laches in the zoning context in spite of far lengthier delays in enforcement. *See* 3 Rathkopf, Law of Zoning and Planning, *supra* at 67–5 n. 3 citing

---

1. Obviously, the zoning board cannot attend to every conceivable violation. Congress itself has implicitly recognized this fact by enacting

D.C.Code 1973, § 5–422, which allows private citizens to bring suit to enforce the zoning laws.

*Donovan v. City of Santa Monica* (Cal.) [88 Cal.App.2d 386], 199 P.2d 51 (20 years); *Appeal of Phillips* (Conn.), 154 A. 238, 113 Conn. 40 (50 years); *Gregory v. City of Wheaton* (Ill.) [23 Ill.2d 402], 178 N.E.2d 358 (10 years); *City of Kansas City v. Wilhoit* (Mo.[App.]), 237 S.W.2d 919; *Universal Holding Co. v. North Bergen Township* (N.J.) [55 N.J.Super. 103], 150 A.2d 44 (8 years); *Bartlett v. City of Corpus Christi* (Tex.Civ.App.), 359 S.W.2d 122 (8 years); *Fabrini v. Kammerer Realty Co.,* 14 Misc.2d 95, 175 N.Y.S.2d 964 (25 years plus); *Matter of Hepner* [Sup.], 152 N.Y.S.2d 984, n. o. r. (14 years); *City of Yonkers v. Rentways, Inc.,* 304 N.Y. 499, 109 N.E.2d 597 (almost 20 years); *City of Milwaukee v. Leavitt* [31 Wis.2d 72], 142 N.W.2d 169 (occupancy permits erroneously granted tenants over 19-year period).

Aside from the lesser degree of municipal culpability, there is another reason why the defense of laches should be more disfavored than the defense of estoppel. Where estoppel is invoked, a landowner must show justifiable reliance. In the context of laches, however, the only reliance which a landowner can show is reliance on nonenforcement of the law, which, I suggest, is never justifiable. Nor does reliance on inactivity become any more justifiable in the case of a self-proclaimed innocent purchaser. As any treatise on the purchase of real property will indicate:

> The buyer should . . . ascertain if any relevant zoning ordinance permits the present use of the premises . . . *He cannot properly assume that the existing use is permitted though long continued, because the municipal authorities may not be estopped from enforcing the zoning laws.* [Friedman, Contracts and Conveyances of Real Property at 133 (2d ed. 1963) (footnote omitted; emphasis supplied).]

*See also* M. Lieberman, Effective Drafting of Contracts for the Sale of Real Property at 170–71 (1954). And *see Hasage v. Philadelphia Zoning Board of Adjustment,* 415 Pa. 31, 202 A.2d 61, 64 (1964), where the same court which decided *In re Heidorn's Appeal,* 412 Pa. 570, 195 A.2d 349 (1963), cited by the majority, wrote:

> It is argued that the applicants purchased the property thinking multiple-family dwelling was permissible, and, acting on such belief, made an investment of approximately $36,000. The answer to this is that they were duty bound to check the zoning status of the property before purchase, and could have required a certificate of such from the seller . . . .

Moreover, in this case, even if petitioner failed to check the zoning laws and failed to require a certificate at the time of sale, he may still have a remedy against the seller. The city notified Mrs. deRochefort on two separate occasions that the building was being maintained in violation of the law. If she concealed her knowledge from petitioner, she is liable for fraud. *Eytan v. Bach,* D.C.App., 374 A.2d 879, 880 (1977); *Andolsun v. Berlitz Schools of Languages of America, Inc.,* D.C.App., 196 A.2d 926, 927 (1964). It is Mrs. deRochefort, then, not the general public, who should make right any injury which petitioner might suffer from enforcement of the zoning laws.

Finally, turning from the equities of the matter to the law, there is one more difference between the defense of estoppel and the defense of laches in this context. There are a fair number of cases holding that, in extraordinary circumstances, the defense of estoppel may bar the enforcement of zoning laws. There are, by contrast, almost no cases allowing the defense of laches. None are cited by Rathkopf, in the Law of Zoning and Planning, *supra.* Yokley, in his treatise, flatly states that

> With respect to the question of laches, we consider it sufficient to say that the doctrine of laches has no application to the enforcement by a municipality of its ordinances. [E. C. Yokley, Zoning Law and Practice § 10–8 at 451 (3d ed. 1965) (footnote omitted).]

The majority, however, has found a case on point.[2] That case is *In re Heidorn's Appeal, supra.* It was followed in one subsequent Pennsylvania decision, *Township of Haverford v. Spica,* 16 Pa.Cmwlth. 326, 328 A.2d 878 (1974), where the delay in enforcement was 36 years. My own research has uncovered no other case in the entire country, let alone the District of Columbia, applying the doctrine of laches against a zoning authority. *See* in this respect, 1 R. Anderson, American Law of Zoning, *supra,* § 6.12 at 333, where it is said:

> No right to a nonconforming use is gained where a use of land in violation of a zoning ordinance is maintained for a period of years. Apparent municipal acquiescence in an unlawful use does not prevent the municipality from urging the illegality when a right to nonconforming use is claimed, but a Pennsylvania court detected laches where a town had failed for 10 years to object to a building which violated a regulation. [Footnotes omitted.]

The case cited is, of course, *Heidorn's Appeal. See also,* Ryan, Pennsylvania Zoning Law and Practice § 8.3.4 (1970), where it is said:

> This 4–3 decision [*Heidorn,* once more] seems out of line with similar cases.

In any event, the sole case relied on by the majority is, in my view, distinguishable from the one at bar. The violation in *Heidorn* concerned an awning which encroached on setback territory. Setback restrictions are generally imposed for purely esthetic reasons. 1 R. Anderson, American Law of Zoning, *supra* § 7.18. And, with respect to esthetics, the Pennsylvania court stated:

> The original homely overhang was there for the world to see and frown upon and if it did not offend the esthetic senses of the Township for some ten years, the present attractive awning and platform should not. The aluminum porch which now graces the front of the Heidorn home improves its appearance considerably and in no way impedes enjoyment by others of their property. There is not the slightest suggestion that the patio effect of the front of the Heidorn home is detrimental to the welfare, safety and health of the community. . .

> No citizen of the Township has objected to what the Heidorns have done. Some 75 houseowners in the immediate vicinage signed a petition urging retention of the patio. [*In re Heidorn's Appeal, supra,* 412 Pa. at 574, 195 A.2d at 351–52.]

By contrast, the petitioner in this case seeks to prevent the city from enforcing side yard, rear yard, lot area and parking restrictions. These requirements are aimed at preventing population congestion, and population congestion is precisely what the use of petitioner's building for residential purposes causes. Such requirements are not trivial.

To limit the density of land use is to promote safety by keeping traffic congestion within manageable bounds, and the prevention of excessive land use tends to simplify the problem of providing essential municipal services and to promote public health. Indeed, the early zoning ordinances were, in large part, prompted by the overcrowding of urban land, and judicial approval of these ordinances was encouraged by an early appreciation of the health and safety hazards inherent in the intensive use of land in central city areas. [1 R. Anderson, American Law of Zoning, *supra* § 7.06 at 486.]

Here, unlike in *Heidorn,* there is reason to believe that the violation in question is detrimental to the welfare, safety and health of the community. Moreover, the record reveals that several citizens so believed and complained to the zoning board.

I respectfully dissent.

---

**2.** The cases cited in footnote 10 of the majority's opinion either do not deal with laches or hold that there was no laches.