Charles SISSON, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

Mildred R. CRARY, Intervenor.

No. 00–AA–97.

District of Columbia Court of Appeals.

Argued Nov. 9, 2001.
Decided Aug. 29, 2002.

Maureen E. Dwyer, with whom Paul J. Kiernan, Washington, was on the brief, for petitioner.

Charles L. Reischel, Deputy Corporation Counsel, filed a first and second statement in lieu of brief.

Before SCHWELB, REID, and WASHINGTON, Associate Judges.

REID, Associate Judge:

This case concerns a challenge to the Zoning Administrator's issuance of several construction permits regarding petitioner Charles Sisson's renovation of his home and garage. Mildred Crary, Mr. Sisson's neighbor, appealed the issuance of the permits to the Board of Zoning Adjustment ("BZA"), which ruled in her favor.[1] Mr. Sisson primarily contends that Ms. Crary's BZA appeal is jurisdictionally and procedurally barred because of untimeliness and laches. He also contends that the BZA erred with respect to its decision on the merits. We affirm the decision of the BZA, which (a) denied Mr. Sisson's motion to dismiss Ms. Crary's appeal; and (b) found that the Zoning Administrator erred by issuing the building permits to Mr. Sisson.

## FACTUAL SUMMARY

Responding to Mr. Sisson's requests, the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") issued five building permits to him between January 29, 1998, and October 5, 1998, covering a rear two-story addition, the garage, and the front porch.[2] Mr. Sisson's home is located in the Northwest quadrant of the District of Columbia, within the Wesley Heights Overlay District ("WHOD"). Residential properties within the WHOD are subject to particularized zoning regulations.

The BZA made extensive factual findings regarding Mr. Sisson's permit applications and the regulatory requirements for the issuance of the requested permits. Although Mr. Sisson's property is actually zoned as WHOD/R–1–A, his permit applications generally were reviewed erroneously as R–1–A or R–1–B, rather than as WHOD/R–1–A.[3] Furthermore, Mr. Sisson's piecemeal application process and his tendency to complete, or substantially complete, work before obtaining a permit made it difficult to determine the full scope of the renovation project.

The first permit issued by DCRA in response to Mr. Sisson's request, dated January 29, 1998, related to a proposed "two-story addition" to the rear of the home. This permit application apparently was examined under the R–1–B zoning classification instead of the WHOD/R–1–A regulations. The BZA found that:

Plans submitted by [Mr. Sisson] as part of his application for the first permit did not reflect all of the construction work that [he] planned to perform at the site. [His] project was developed in a piecemeal manner and the various applications were often incomplete or otherwise misleading in that they did not always reflect [Mr. Sisson's] plans for the garage, rear addition, and front porch consistently and accurately.

1. Ms. Crary did not file an appellate brief in this case.

2. In actuality, the Department issued a sixth permit to Mr. Sisson on October 11, 2000, although that permit is not before the court for review at this time.

3. The R–1–A and WHOD/R–1–A zoning classifications specified requirements for minimum

lot area, minimum lot width, lot occupancy, floor area ratio, minimum front yard, minimum rear yard, minimum side yard, and off-street parking; and the R–1–A and WHOD/R–1–A classifications contained different requirements for lot occupancy, floor area ratio, and minimum front yard. The applicable zoning requirements for Mr. Sisson's renovation had to be considered in light of the existing dimensions of his home and garage.

The second permit issued by DCRA, dated February 9, 1998, concerned an addition to Mr. Sisson's garage. The permit was issued pursuant to the R–1–A, rather than the WHOD/R–1–A regulations. The BZA's factual findings establish that "the second permit authorized an addition to an existing garage"; Mr. Sisson "demolished [the existing garage] without authorization"; and constructed a new garage "that was larger than the approved garage addition."

A third permit for the construction of a new garage, dated May 27, 1998, replaced the February 1998 permit, and "was issued after the new garage was already substantially completed." Moreover, "[t]he large size of the new garage also exceeded the dimensions allowed by the third building permit." [4]

DCRA issued a fourth permit, dated August 17, 1998, to repair a roof allegedly situated over Mr. Sisson's porch. The permit was issued pursuant to the R–1–B zoning regulations, rather than the appropriate WHOD/R–1–A regulations. In addition, even though this permit covered repairs to an existing porch roof, "at the time the permit was issued, the porch was open and did not have a roof." The fifth and final permit, dated October 5, 1998, was issued to build a "new porch roof." In this court, "Mr. Sisson concedes that the BZA did not commit reversible error in finding that the two front porch permits (August and October 1998) were not appropriately issued ... [and does] not contest[ ] the validity of BZA's rejection of the front porch permits."

Ms. Crary filed her BZA appeal on September 18, 1998, approximately two weeks prior to the issuance of the fifth and final permit in this case. In response to Mr. Sisson's contention that Ms. Crary's appeal was barred by untimeliness, the BZA stated:

The Board concludes that the Appeal was timely with respect to all five permits. [Mr. Sisson] submitted five separate applications for building permits that all related to work performed on a single property. Because of the cumulative, piecemeal nature of the applications, the full extent of [Mr. Sisson's] construction project could not be discerned as each individual permit was issued and therefore they must be considered as a whole.... The Board is not persuaded that the first permit put [Ms. Crary] on notice of all the work to be done on [Mr. Sisson's] property or, therefore, that the work allegedly violated the Zoning Regulations.

Other factors also support our conclusion that [Ms. Crary] was not "chargeable with notice" as soon as the first permit was issued. [Mr. Sisson's] various permit applications contained errors of omission or were otherwise misleading in that they did not reflect all existing and planned improvements accurately and consistently.... Because of these errors, zoning violations arising from the failure to comply with lot occupancy and setback requirements of the Wesley Heights overlay, in particular, were not apparent until the work was substantially completed on [Mr. Sisson's] property. Moreover, some work was performed beyond the scope of the permit, as with the demolition of the existing garage and the construction of a new garage larger than the dimensions specified on the permit, and two of the permits (the

---

4. A new permit was required when structural impediments prevented Mr. Sisson from completing the addition to the garage as originally planned. After discovering the structural problem, however, Mr. Sisson continued construction without first obtaining a new permit. When the DCRA received Ms. Crary's complaint about Mr. Sisson's construction, an investigation was conducted, resulting in a Stop Work Order.

third and fifth) were issued for work that was undertaken prior to receiving the permits. Therefore, the Board concludes that [Ms. Crary] was not chargeable with notice of the entire scope of work performed at [Mr. Sisson's] property until all of the permits were issued.[5]

With respect to Mr. Sisson's argument regarding laches, the BZA declared: "Any delay in filing the appeal was not unreasonable but resulted from the fact that [Mr. Sisson] applied for separate building permits for each component of the construction on his property." Thus, there was no "unexcused delay." As for the merits of Ms. Crary's Appeal, the BZA asserted, in part:

The Board concludes that the work performed on [Mr. Sisson's] property increased its nonconforming aspect with respect to setbacks and lot occupancy.

As [the Zoning Administrator] acknowledged at the public hearing, the permits for the garage should not have been issued if the garage did not provide access in conformance with the zoning regulations. The two-car garage [which Mr. Sisson constructed] is accessible only through an easement that, at a width of eight feet, is narrower than the minimum width of 14 feet specified in the zoning regulations for a driveway with two-way circulation serving a parking space.

The Board concludes that the Zoning Administrator erred in issuing the five building permits to [Mr. Sisson]. The Zoning Administrator's decisions were not based on complete and accurate information about [Mr. Sisson's] property, reflecting all existing and planned improvements. The zoning Administrator also failed to apply the correct zoning classification, which resulted in the issu-

ance of permits that did not conform to applicable zoning provisions, especially the Wesley Heights Overlay District, in several material respects. The violations stemming from erroneously issued permits were compounded in this case by the fact that some work, with respect to the garage and front porch, was not performed strictly in compliance with the permits.

Ms. Crary filed her appeal on September 18, 1998, prior to the issuance of the fifth permit on October 5, 1998, for a new porch roof. At a February 17, 1999, hearing, Ms. Crary sought to amend her BZA appeal to include two permits not addressed in her original notice of appeal. The BZA granted the amendment.

### ANALYSIS

■ Mr. Sisson continues to press his jurisdictional and procedural arguments in this court. In addition, he contends that his new garage and the two-story rear addition to his home do not violate the zoning regulations. "We accord great deference to an agency's interpretation of its own administrative regulations, and we will uphold that construction unless clearly erroneous or inconsistent with the regulations. . . . Moreover, the agency's judgment . . . is entitled to additional deference [where] it was interpreting its own internal rule of procedure rather than the Zoning Regulations." *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 431 A.2d 560, 565 (D.C.1981) (citations and references omitted); *see also, Waste Mgmt. of Md., Inc. v. District of Columbia Bd. of Zoning Adjustment*, 775 A.2d 1117, 1122 (D.C.2001) (citing *Goto v. District of Columbia Bd. of Zoning Adjustment*, 423 A.2d 917, 924 (D.C.1980) (ci-

---

5. Both the Zoning Administrator and Ms. Crary's attorney had difficulty locating the third and fourth permit in DCRA's records. In fact, Ms. Crary did not locate the third permit until January 1999.

tations omitted)). However, we are required to "[t]o hold unlawful and set aside any action or findings and conclusions found to be ... [a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] in excess of statutory jurisdiction, authority, or limitations or short of statutory jurisdiction, authority, or limitations or short of statutory rights." D.C.Code § 2–510(a)(3)(A),(C) (2001). Furthermore, "[t]he timely filing of an appeal with the BZA is mandatory and jurisdictional." *Mendelson v. District of Columbia Bd. of Zoning Adjustment*, 645 A.2d 1090, 1093 (D.C.1994) (referencing *Woodley Park Cmty. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 490 A.2d 628, 635 (D.C.1985)) (other citations omitted).

■■ We turn first to Mr. Sisson's argument that the BZA should have dismissed Ms. Crary's appeal on the ground that it was untimely. The underlying events critical to this issue occurred around 1998. In 1998, BZA regulations required a "timely" appeal. While there was no time limitation specified in statute or regulation, our case law generally held that the filing had to be within a "reasonable period" after the appellant was chargeable with notice of the decision that was the subject of the appeal. As this Court said in *Woodley Park Cmty. Ass'n, supra*, "[b]ecause the rules of the BZA adopt no specific time limit on appeals, a standard of reasonableness is applied in determining whether an appeal is timely." [6] 490 A.2d at 636 (citation and references omitted). More recently, we have stated that "[a]t least in the absence of exceptional circumstances substantially impairing the *ability* of an aggrieved party to appeal—circumstances outside the party's control—we conceive of two months between notice of a decision and appeal therefrom as the limit of timeliness." *Waste Mgmt. of Md., supra*, 775 A.2d at 1122 (emphasis in the original).

■ Ms. Crary's case, as the BZA implicitly determined, falls under the principle of "exceptional circumstances substantially impairing the *ability* of an aggrieved party to appeal—circumstances outside of the party's control." *Id.* Application of this principle supports the Board's conclusion that the timing of Ms. Crary's BZA appeal was not unreasonable, precisely because circumstances beyond her control impacted the timeliness of her filing. As the BZA determined, "[b]ecause of the cumulative, piecemeal nature of the applications, the full extent of [Mr. Sisson's] con-

6. The applicable BZA rule stated:

 Any person aggrieved by any order, requirement, decision, determination, or refusal made by an administrative officer or body, including the Mayor of the District of Columbia, in the administration or enforcement of the Zoning Regulations, may file a timely appeal with the Board as may be provided by the Board.

 11 DCMR § 3315.2 (1995). This provision was recodified in 1999 as 11 DCMR § 3112.2 (1999), 46 D.C.Reg. 7900 (1999). A notice of proposed rulemaking modifying this provision was published on May 24, 2002, 49 D.C.Reg. 4884 (2002), but apparently has not yet become final. The proposed rule would require an appeal to be filed "within sixty days (60) from the date the person appealing ... had notice or knowledge of the decision complained of, or reasonably should have had notice or known of the decision complained of, whichever is earlier." 49 D.C.Reg. at 4884. However, it also states:

 The [BZA] may extend the sixty (60) day deadline for the filing of an appeal only if the appellant demonstrates that:
 (1) There are exceptional circumstances that are outside of the appellant's control and that could not have been reasonably anticipated that substantially impaired the appellant's ability to file an appeal to the Board; and
 (2) The extension of time will not prejudice the parties to the appeal....

 49 D.C.Reg. at 4885.

struction project could not be discerned as each individual permit was issued and therefore they must be considered as a whole." Thus, "[Ms. Crary] was not chargeable with notice of the entire scope of work performed at [Mr. Sisson's] property until all of the permits were issued." The factual record supports this conclusion.

Not only were most of the permits issued under the wrong zoning classification, but each of the individual permits failed to reflect the entire scope of Mr. Sisson's proposed renovations. The first permit, issued in January 1998, covered a proposed two-story addition to Mr. Sisson's home, but did not authorize any garage or front porch modifications. The second permit, relating only to the garage construction, contained information that was not entirely consistent with that provided in conjunction with the first permit. Indeed, during the hearing on Ms. Crary's appeal, the BZA questioned Mr. Sisson at length about relevant omissions in his permit application. Those omissions related to the overall construction renovations at his home. Ultimately, the District issued a Stop Work Order when it appeared that Mr. Sisson's renovations did not comport with the permit issued to him by the DCRA. In fact, although his "permit authorized an addition to an existing garage," Mr. Sisson "demolished [the existing garage] without authorization," and ultimately constructed a new garage, for which he had no permit, "that was larger than the approved garage addition." Mr. Sisson then applied for a new permit relating to the garage after the District issued the Stop Work Order. He obtained the secondary garage permit, the third of the five, on May 27, 1998, at a time when the new garage was substantially complete. In fact, even the secondary permit raises questions, as evidenced by discrepancies between the permit itself and the actual construction of the garage, particularly

with respect to its physical location. While the secondary garage permit authorized a "[n]ew garage to be located on same spot as previous garage," when questioned directly about this issue by the Vice Chair of the BZA, Mr. Sisson confirmed very little other than that the old and new garages shared a common wall. As to the porch, Mr. Sisson concedes that the fourth and fifth permits at issue in this case "were not appropriately issued."

Mr. Sisson argues that this court's approach in *Woodley Park Cmty. Ass'n, supra*, should control the timing of Ms. Crary's appeal to the BZA in this case, and that under that decision, her appeal was untimely. There, as in Mr. Sisson's case, the appellants before the BZA challenged permits issued on separate dates concerning different aspects of the relevant construction project, but did not file separate BZA appeals at the time each permit was issued. Rather than assessing the timeliness question in terms of the cumulative nature of the hotel project, however, this court analyzed the timeliness of the appeal on the issues of "height, setback, and accessory use" as a discrete matter, separate and apart from the timeliness of the challenge relating to parking issues. Mr. Sisson urges the court to adopt the *Woodley Park* approach in his case, rather than the analysis followed by the BZA in this case.

Significantly, "[t]his court is not to substitute its judgment for that of the agency, and ... the decision of the BZA will be upheld provided there is a rational basis for it." *Gladden v. District of Columbia Bd. of Zoning Adjustment*, 659 A.2d 249, 253 (D.C.1995) (quotation omitted). Moreover, *Woodley Park* does not compel a decision different from that reached by the BZA, because it is distinguishable. We note first that the issue here pertains to renovations on private residential property and a challenge by a single individual, whereas *Woodley Park* involved the con-

struction of a hotel and a challenge by a community association on other grounds. Furthermore, the parties in *Woodley Park* engaged in negotiations through a task force on which the Woodley Park Community Association was represented. The negotiations lasted for many months, during which the hotel construction project was discussed at length. Consequently, the negotiations provided the BZA appellants ample opportunity to become thoroughly informed about and to raise objections relating to height, setback, and accessory use. "Thus, by October 6, 1978—the date the full building permit was issued—the [appellants before the BZA] had full actual notice of the aspects of the building project relating to height, setback, and use. Nevertheless, one year elapsed between the issuance of the building permit and the filing of the appeal on October 12, 1979." *Woodley Park Cmty. Ass'n, supra,* 490 A.2d at 637. Under those particular circumstances, the court concluded that the challenge relating to height, setback, and use was not timely filed.

Unlike the facts that gave rise to the court's approach to the multi-permit question in *Woodley Park,* Mr. Sisson did not engage in a thorough negotiation process during which Ms. Crary would have been informed about all of Mr. Sisson's construction plans on his property. In short, there was no lengthy, intense and extensive effort by Mr. Sisson to collaborate with Ms. Crary and the local neighborhood associations on his construction project. In contrast, the negotiation process in *Woodley Park* rendered "unreasonable" the timing of the appeal as to height, setback, and use.[7]

Given the factual history of Mr. Sisson's permit applications, which lacked the kind of persistent and close collaboration with

neighbors that was present in *Woodley Park,* the BZA reasonably concluded:

> Plans submitted by [Mr. Sisson] as part of his application for the first permit did not reflect all of the construction work that [he] planned to perform at the site. [Mr. Sisson's] project was developed in a piecemeal manner and the various applications were often incomplete or otherwise misleading in that they did not always reflect [his] plans for the garage, rear addition, and front porch consistently and accurately.

Significantly, the problematic permit history surrounding Mr. Sisson's renovations, coupled with the fact that some of the permits issued by the BZA were faulty on their face, constitute the very circumstances that were beyond Ms. Crary's control, *see Waste Mgmt. of Md., supra,* 775 A.2d at 1122, and make applicable the "extraordinary circumstances" exception in *Waste Mgmt.* Consequently, we affirm the BZA decision that Ms. Crary's appeal was timely.

We turn next to Mr. Sisson's argument that Ms. Crary's appeal was procedurally barred by laches and estoppel. At the outset, we reiterate a fundamental notion that has controlled our treatment of these doctrines in prior cases: "[T]he defenses of estoppel and laches are judicially disfavored in the zoning context because of the public interest in enforcement of the zoning laws." *Beins v. District of Columbia Bd. of Zoning Adjustment,* 572 A.2d 122, 126 (D.C.1990) (citing *Goto, supra,* 423 A.2d at 925) (other citation omitted). Laches "is rarely applied [in the zoning context] 'except in the clearest and most compelling circumstances.'" *Id.* (quoting *Wieck v. District of Columbia Bd. of Zoning Adjustment,* 383 A.2d 7, 11 (D.C.1978) (citation omitted)). While we give defer-

---

7. We reiterate that the Court decided *Woodley Park* when the "reasonableness" test con-

trolled the jurisdictional timeliness question.

ence to the BZA's findings with respect to laches, " '[w]hether the facts, taken together, are sufficient to sustain the defense of laches ... is a question of law,' to be answered *de novo* by the appellate court." *Id.* (quoting *American Univ. Park Citizens Ass'n v. Burka,* 400 A.2d 737, 741 (D.C.1979) (alterations in the original)).

 "[T]o determine the validity of a laches defense, we look to the entire course of events." *Goto, supra,* 423 A.2d at 925 n. 16 (reference and citation omitted). "Laches will not provide a valid defense, however, unless two tests are met: the defendant has been prejudiced by delay and that delay was unreasonable. In the absence of an analogous statute of limitations, the party asserting the defense has the burden of establishing *both elements.*" *American Univ. Park Citizens Ass'n, supra,* 400 A.2d at 740 (citations omitted) (emphasis added).

 The record before us does not reflect "the clearest and most compelling circumstance[ ]" requiring the application of the laches doctrine. *Beins, supra,* 572 A.2d at 126. Indeed, we agree with the BZA's conclusion that the first element of laches, unreasonable delay, is not present in this case.[8] As "the entire course of events," *see Goto, supra,* 423 A.2d at 925 n. 16, and the BZA factual record in the case show, the BZA properly determined that: "Any delay in filing the appeal was not unreasonable but resulted from the fact that [Mr. Sisson] applied for separate building permits for each component of the construction on his property." Consequently, we affirm the BZA's decision that the doctrine of laches does not apply in this case.

 We have also previously set forth the elements of estoppel, while noting that the doctrine is "not judicially favored," *Wieck, supra,* 383 A.2d at 10 (references and citations omitted), and that its application is " 'limited [to] situations when the equities are strongly in favor of the party invoking the doctrine.' " *Id.* (quoting *District of Columbia v. Stewart,* 278 A.2d 117, 119 (D.C.1971) (citation and footnote omitted)). To make out a case of estoppel Mr. Sisson must show that: "(1) acting in good faith, (2) on affirmative acts of [the DCRA], (3)[he] ma[de] expensive and permanent improvements in reliance thereon, and (4) the equities strongly favor [him]." *Wieck, supra,* 383 A.2d at 11 (referencing *District of Columbia v. Cahill,* 60 App.D.C. 342, 344, 54 F.2d 453, 454–55 (1931)).

 On the record before us, we cannot say that Mr. Sisson acted in good faith in presenting the proposed renovations to his property in piecemeal fashion, or in demolishing his old garage and proceeding to construct a new garage without proper permits, or in building a new garage "that was larger than the approved garage addition." Nor can we conclude that Mr. Sisson initially relied on DCRA-issued permits that authorized him to demolish his existing garage and construct a new garage of larger dimensions than those approved for a garage addition. And, the record does not support Mr. Sisson's implicit assertion that the equities strongly favor him in this case. Thus, we see no reason to disturb the BZA's decision not to apply the estoppel doctrine to bar Ms. Crary's appeal.[9]

---

**8.** Since the first element of the laches doctrine is not satisfied, we need not address the second.

**9.** Furthermore, as we indicated in *Goto, supra,* 423 A.2d at 925 n. 15, and reiterated in *Rafferty v. District of Columbia Zoning*

*Comm'n,* 583 A.2d 169, 176 (D.C.1990) (*Rafferty I* ), "[i]t is not clear that estoppel will bar a case brought by a neighboring landowner; arguably, that defense may be asserted only against the municipality which rendered the

Finally, Mr. Sisson argues that: "Even if the appeal were not untimely and otherwise barred by the doctrines of laches and estoppel, the testimony before the [BZA] did not support the conclusion that the rear addition and the garage were in violation of the regulation[s] applicable in the [WHOD/R–1–A]." "In reviewing a BZA decision, we must determine '(1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings.'" *Mendelson v. District of Columbia Bd. of Zoning Adjustment, supra,* 645 A.2d at 1094 (quoting *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 31 (D.C. 1992) (quoting *Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990))) (other citations omitted).

We are satisfied that: (1) the Board's conclusion—that the Zoning Administrator erred by issuing the five permits that are the subject of this case—is supported by its material findings of fact and substantial evidence of record, (2) and that its legal conclusion flows rationally from its findings. Not all of Mr. Sisson's permit applications were scrutinized under the WHOD/R–1–A regulations. As the BZA indicated:

A more significant oversight [of the Zoning Administrator] was the failure to recognize that [Mr. Sisson's] property is located within the Wesley Heights Overlay District. Thus, the more stringent WHOD provisions were not applied, and permits were issued that purported to allow work that does not comply with relevant lot occupancy and setback requirements. The oversight was compounded by the fact that the full scope of the work planned for [Mr. Sisson's] property was not depicted consistently and accurately on all permit applications, thus precluding an assessment of each individual permit application within the context of all existing and planned improvements.

The BZA also recognized that "[Mr. Sisson's] property is nonconforming because its lot area, lot width, and setbacks are smaller than the minimums prescribed in the WHOD/R–1–A zone, and because its lot occupancy is higher than the prescribed maximum." This meant, as the BZA found, "that the work performed on [Mr. Sisson's] property increased its nonconforming aspect with respect to setbacks and lot occupancy."

Despite these BZA conclusions, Mr. Sisson asserts that the BZA erred in its application of the regulation set forth at 11 DCMR § 2117.8,[10] and in its finding of

decision on which a party relied." 423 A.2d at 925, n. 15 (references omitted).

10. Section 2117.8 of 11 DCMR provides in pertinent part:
 A driveway which provides access to required parking spaces shall meet the following standards:
 . . . .
 (b) A driveway serving a one-family dwelling or flat or which otherwise serves only one parking space shall be not less than seven feet (7 ft.) in width;
 (c) A driveway serving any use other than a one-family dwelling or flat, *or* which

serves more than (1) parking space shall be as follows:
 (1) Not less than twenty-five feet (25 ft.) from a street intersection as measured from the intersection of the curb line extended;
 (2) Not less than twelve feet (12 ft.) in width if designed for on[e]-way circulation or fourteen feet (14 ft.) if designed for two-way circulation; and
 (3) Not more than twenty-five feet (25 ft.) in width.
11 DCMR 2117.8 (1995) (emphasis added).

fact No. 14.[11] On the record before us, we cannot say that the BZA erroneously applied its regulation by citing subsection (c) of 11 DCMR 2117.8, rather than subsection (b) in accordance with Mr. Sisson's view. Subsection (c) applies to a "driveway ... which serves more than one (1) parking space" and which involves "two-way circulation." The Zoning Administrator's testimony before the BZA showed clear concern for ingress and egress as well as access to and from a public street or alley through a recorded easement. In addition, the Zoning Administrator recognized that the larger garage would accommodate two cars, and that there would be two-way circulation to and from Mr. Sisson's garage. We defer to an agency's reasonable interpretation of its regulations that is consistent with its governing statute. See Dupont Circle Citizens Ass'n, supra, 431 A.2d at 565. Given the language of the regulation and the Zoning Administrator's testimony at the BZA hearing, if we decided that subsection (b) of 11 DCMR § 2117.8 applied instead of subsection (c), we would be substituting our judgment for that of the BZA. That we cannot do. See Gladden, supra, 659 A.2d at 253.

Based upon our review of the record before us, the BZA's penultimate conclusion flows rationally from its findings and is amply supported by evidence of record:

The Board concludes that the Zoning Administrator erred in issuing the five building permits to [Mr. Sisson]. The Zoning Administrator's decisions were not based on complete and accurate information about [Mr. Sisson's] property, reflecting all existing and planned improvements. The Zoning Administrator also failed to apply the correct zoning classification, which resulted in the issuance of permits that did not conform to applicable zoning provisions, especially the Wesley Heights Overlay District, in several material respects. The violations stemming from erroneously issued permits were compounded in this case by the fact that some work, with respect to the garage and front porch, was not performed strictly in compliance with the permits.

Consequently, we do not have grounds to reverse the BZA regarding its determination on the merits of Ms. Crary's appeal.

Accordingly, for the foregoing reasons, we affirm the Order of the Board of Zoning Adjustment.

*So ordered.*

---

11. Finding of fact No. 14 stated:

A driveway providing access to required parking spaces must meet certain standards, including that a driveway serving more than one parking space must be at least 12 feet wide if designed for one-way circulation or at least 14 feet wide if designed for two-way circulation. 11 DCMR § 2117.8.