Anne Page CHIAPELLA,
et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent

and

Sunrise Connecticut Avenue Assisted
Living, LLC, Intervenor.

No. 05–AA–656.

District of Columbia Court of Appeals.

Argued Jan. 25, 2007.
Decided Aug. 14, 2008.

---

Andrea C. Ferster, for petitioners, Anne Page Chiapella and Nebraska Avenue Neighborhood Association.

Deborah B. Baum, with whom Maureen E. Dwyer and David M. Avitabile were on the brief, for intervenor Sunrise Connecticut Avenue Assistant Living, LLC.

Edward E. Schwab, then Deputy Solicitor General for the District of Columbia, filed a statement on behalf of respondent D.C. Board of Zoning Adjustment that it would not file a brief "but stands on the decisions below and the defense intervenor makes."

Before RUIZ and KRAMER, Associate Judges, and WINFIELD, Senior Judge, Superior Court of the District of Columbia.*

RUIZ, Associate Judge:

Dr. Anne Paige Chiapella and the Nebraska Avenue Neighborhood Association ("NANA") petition this court to review and reverse a final order of the District of Columbia Board of Zoning Adjustment ("BZA") dismissing Appeal No. 17127, which alleged zoning violations relating to permits issued on August 25 and November 7, 2003. We conclude that the BZA properly dismissed the appeal of the August permit, but that the BZA erred in dismissing certain allegations raised in the appeal of the November permit. We remand the case so that the Board may consider those allegations.

## I. Factual Background

In the summer of 2002, Sunrise Connecticut Avenue Assisted Living, L.L.C. ("Sunrise") commenced construction of an assisted living facility ("the facility") located at 5111 Connecticut Avenue, N.W. Between March, 2001 and March, 2003, Dr. Chiapella filed three appeals with the BZA alleging that the facility was in violation of several zoning regulations. The BZA issued final orders in each of those matters, which are not the subject of the current controversy before this court.

On January 6, 2004, Dr. Chiapella, NANA, and Advisory Neighborhood Commission (ANC) 3/4G filed an appeal with the BZA challenging six permits issued for the facility between July 15 and November 7, 2003.[1] Of the six permits they appealed to the BZA, petitioners continue to challenge two before this court, the permits issued on August 25 and November 7, 2003. Petitioners allege that these permits established that the facility was in violation of the municipal regulations because (1) the trash room impermissibly "extend[ed] into the required rear yard"; (2) the floor area ratio (FAR)[2] was in excess of that permitted by the regulations; and (3) the facility had insufficient loading space.[3]

A hearing was scheduled before the BZA for April 13, 2004. A few days before the hearing, on April 8, Sunrise filed a motion to dismiss in which it argued that the principles of *res judicata* and collateral estoppel barred petitioners from raising the issues listed in petitioners' January 6, 2004 appeal. At the hearing, petitioners agreed to drop their challenges to four of the six revised permits and opted to challenge only two permits: one issued on August 25, 2003 (No. B454315) and another issued on November 7, 2003 (No. B456618). Because the motion to dismiss had been filed only a few days prior to the April 13 hearing, the BZA set a new hearing date for May 25, 2004 "in order to dispose of the preliminary matter ...

---

* Sitting by designation pursuant to D.C.Code § 11-707(a) (2001).

1. We refer to Dr. Chiapella and NANA as "petitioners." ANC 3/4G has not joined Dr. Chiapella and NANA in their petition to this court.

2. The "floor area ratio" is "a figure that expresses the total gross floor area as a multiple of the area of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.

3. Petitioners' appeal of the other permits also alleged that (1) the building was too tall; (2) the use of the property as an assisted living home for the elderly was impermissible; (3) there were too few parking spaces for the building's residents; and (4) the roof of the building was noncompliant for several reasons.

[Sunrise's] motion to dismiss." BZA Chairperson Geoffrey Griffis made clear that the purpose of the May 25 hearing was to discuss Sunrise's motion to dismiss, and in the event that the motion was denied, the BZA would set a new hearing date to discuss the merits of the appeal. Vice–Chair Ruthanne Miller reiterated that the purpose of the May 25 hearing was to discuss the motion to dismiss, but added that, in addition to the *res judicata* and collateral estoppel arguments raised in the motion to dismiss, Sunrise had "raised a question regarding [the] timeliness [of the appeal of the August, 25, 2003 permit],"—thus putting both parties on notice that the issue of timeliness also would be discussed at the May 25 hearing.

The May 25, 2003 hearing took place as scheduled. However, notwithstanding that the BZA had specifically told the parties that the hearing would cover only Sunrise's motion to dismiss based on *res judicata* and collateral estoppel and the timeliness of the appeal of the August permit, at the hearing Dr. Chiapella was asked several questions by the Commissioners relating to the merits of petitioners' allegations that (1) the trash room impermissibly extended into the rear yard and (2) the building exceeded the allowable FAR.

With respect to the trash room, Dr. Chiapella's argument was that the room encroached upon the rear yard in violation of the "minimum depth" requirements for the rear yard of buildings in the District of Columbia, *see* 11 DCMR § 404.1. The Commissioners inquired whether the trash room was an "accessory building," which the regulations specifically require to be located in the rear yard. *See* 11 DCMR § 2500. Dr. Chiapella responded that the trash room was not an "accessory building," but "a continuation of the [main] building that sticks out from the building."

With respect to the FAR, the Commissioners asked Dr. Chiapella "what is [the] existing [FAR] and ... how [is the Sunrise facility] over?" Dr. Chiapella conceded that she did not have a "calculation of the exact amount," because she was basing her estimate on a 2001 plan of the facility that had been superseded by other plans. In response to Dr. Chiapella's admission that she did not have the precise FAR calculation on hand, Zoning Commissioner Carol Mitten queried:

> Why not? You have—you have—you have had access to all the drawings. You have—you have an expert on your side who can do the calculation. So, why haven't you done the calculation?

> . . .

> Because that's where it comes down to. You have to be able to—to show us and today is the day that—that they have developed a building that occupies more than 80,876.28 square feet of zoning density. Do you have that evidence?

In response, Dr. Chiapella proffered that based on the 2001 drawing, the facility's FAR was close to the permissible limit under the regulations, and since then there had been "an additional room that's added on ... [t]hat on its own brings the gross floor area over what is allowed." Dissatisfied with Dr. Chiapella's approximation of the facility's FAR, Chairperson Griffis stated:

> No longer is it time for general assertions. Today is the day to show up with the facts, with the substance. It should take you five minutes to direct our attention to this is add [sic]. This is the total allowable [FAR]. This is how it's over.

At the end of the hearing, the BZA voted unanimously to grant Sunrise's motion to dismiss the appeal with respect to the August permit as untimely filed, but

denied its motion to dismiss with respect to the appeal challenging the November permit, concluding that it was not barred by *res judicata* or collateral estoppel. The BZA did not adjourn the hearing after ruling on Sunrise's motion to dismiss; instead, Chairperson Griffis stated "[n]ow, of course, it's the Board's jurisdiction to somewhat define an appeal ... I think we've heard a substantial amount to the threshold level of where the Board would be to decide whether there was substance and merit to hold the hearing on appeal." Vice Chairperson Miller then added:

> Mr. Chairman, I'd like to put a motion on the table for our discussion and that would be to dismiss [the appeal challenging] the second permit issued November 5, 2003 and the grounds for that would be a failure to state.

> This is somewhat analogous to a court case, but a failure to state a claim upon which relief can be granted and the grounds for that is that at this point in the proceeding, [Dr. Chiapella] has failed to state with particularity what the error is that's being alleged ... And in exploring that issue today even, there wasn't any evidence that [Dr. Chiapella] was hindered in any way or impaired in any way from getting information that she needed and this Board has spent over an hour trying to figure out what, in fact, the error is. What, in fact, [she] claims the FAR is—or what over the AR [Sunrise] has gone ... I think Appellant should have been able to articulate what the error was that was being complained of and despite our trying to get that information, we were unable to even get that information today. So I think at this point it's appropriate to dismiss the case.

The Board then voted unanimously to "dismiss [the appeal challenging] the second permit issued November 7, 2003 because ... [petitioners] failed to state with particularity what is the error of the permit."

The BZA issued its final written order on June 2, 2005. The order reiterated that it dismissed the appeal of the August 25, 2003 permit as untimely, because it was filed on January 6, 2004, more than sixty days after its issuance, and no exceptional circumstances excused the late filing. With respect to the November permit, the BZA said that it was dismissing petitioner's FAR claim because petitioners "never stated [its FAR claim] with any particularity." The BZA rejected the claim that the trash room unlawfully protruded into the rear yard, after determining that the trash room is an "accessory building" which the regulations specifically require be located in the rear yard. The order did not mention petitioners' claim that the facility had insufficient loading space.

Dr. Chiapella and NANA now petition our review of the BZA's dismissal of their appeal of both the August permit and rejection of their challenges to the November permit. Petitioners argue that the BZA erred in its determination that there were no "exceptional circumstances" justifying the late filing and its consequent dismissal of the appeal of the August permit as untimely. With respect to their appeal of the November permit, they argue that the BZA's dismissal on the merits (1) violated their rights to notice and a hearing under the Zoning Act and the D.C. Administrative Procedures Act; (2) erroneously concluded that petitioners failed to state a claim of zoning noncompliance with sufficient particularity; and (3) did not address their claim that the facility has insufficient loading space.

## II. Analysis

 This court's review of a decision by the BZA is circumscribed by law. "Ultimately, we must sustain the BZA's action

unless it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Kuri Bros. v. D.C. Bd. of Zoning Adjustment,* 891 A.2d 241, 244–245 (D.C.2006) (quoting D.C.Code § 2–510(a)(3)(A) (2001)). We must determine: (1) whether the agency has made a finding of fact on each material factual issue; (2) whether substantial evidence of record supports each finding, and (3) whether conclusions legally sufficient to support the decision flow rationally from the fact-findings. *See Levy v. D.C. Bd. of Zoning Adjustment,* 570 A.2d 739, 740 (D.C.1990). In addition, "[a]n agency's interpretation of a statute that it administers will stand unless that interpretation, considered in light of the statute's language and legislative history, is unreasonable." *Bannum, Inc. v. D.C. Bd. of Zoning Adjustment,* 894 A.2d 423, 429 (D.C.2006). "However, although we accord weight to the agency's construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court." *Kuri Bros.,* 891 A.2d at 245 (internal quotation marks and citation omitted).

## A. Timeliness of Administrative Appeal—The August 25, 2003 Permit

█ Under the applicable BZA regulation "[a]n appeal shall be filed within sixty (60) days from the date the person appealing the administrative decision had notice or knowledge of the decision complained of, or reasonably should have had notice or knowledge of the decision complained of, whichever is earlier." 11 DCMR § 3112.2. The BZA may extend this time limit only if

(1) there are exceptional circumstances that are outside of the appellant's control and could not have been reasonably anticipated that substantially impaired the ability to file the appeal, and (2) the

extension of time would not prejudice the rights of other parties to the appeal. *Id.* § 3112.2(d). There is no dispute that the appeal of the August 25, 2003 permit (filed on January 6, 2004) was outside of the sixty-day period prescribed in the regulation. Petitioners argue, however, that exceptional circumstances existed to justify extending the sixty-day period in this case because "due to the piecemeal manner in which [Sunrise's] permit revisions were processed, the substantial nature of the changes made to the original building permit was not apparent until the final permit was issued on November 7, 2005." *See Sisson v. D.C. Bd. of Zoning Adjustment,* 805 A.2d 964, 967, 971 (D.C.2002) (affirming BZA's conclusion that an appeal filed outside of the sixty-day window was justified because as a result of the "cumulative, piecemeal nature of the applications, the full extent of [the] construction project could not be discerned as each individual permit was issued and therefore they must be considered as a whole").

We conclude that the BZA properly dismissed the appeal of the August 25 permit. At the hearing, Dr. Chiapella explained some of the difficulties she had encountered obtaining information about the plans, which she said she received in a "piecemeal fashion" ("Over 25 visits [to DCRA], many of which produced nothing and incomplete plans."). Dr. Chiapella added that she delayed appealing the permit because "if you're filing an appeal on each one individually, it's $800 per filing," and because obtaining the ANC's support at that point would have been difficult. Dr. Chiapella recognized the possibility that other permits would be granted, decided to wait, and eventually filed on January 6, 2004 an appeal covering six permits, including the two permits she continues to challenge in this court, as a way of enhancing the probability that she would secure the ANC's support (which she eventually

did obtain) and reducing the cost by challenging all the permits in one appeal. Petitioners maintained at the hearing and argue before this court that these factors constituted "extraordinary circumstances" justifying the untimely filing of the appeal of the August permit. The BZA disagreed, noting that this case is unlike *Sisson*, where an untimely appeal was excused because the successive manner in which permit applications were made rendered "the full extent of [the] construction project [impossible to] discern[ ]." 805 A.2d at 967. As the BZA stated in the order dismissing the appeal of the August permit as untimely, the alleged violations relating to that permit were known or should have been known to Dr. Chiapella "when it was issued on August 25, 2003, or shortly thereafter." This is a factual finding that is supported by substantial evidence in the record, and Dr. Chiapella has not disputed that she was aware that the permit was issued and of the violations she alleges in time to file a timely appeal.[4] Rather, as Dr. Chiapella explained, she elected to wait until a later date to save money and garner support from ANC 3/4G.[5] Although her reasons to delay may be understandable, they were not "outside of the appellant's control," nor were they reasonably

unforeseeable. 11 DCMR § 3112.2(a)(1). Accordingly, we conclude that the BZA's determination that there were no "extraordinary circumstances" excusing the untimely filing of the appeal was not arbitrary or capricious.

**B. Dismissal of Appeal Without Notice and an Evidentiary Hearing—The November 3, 2003 Permit**

Under D.C.Code § 6–641.07(f) (2001), when there is an appeal to the BZA, "[t]here shall be a public hearing."[6] We have held that if the appeal presents solely issues of law and there are no additional "adjudicative facts" material to the BZA's ruling, a "full-scale evidentiary hearing" is not required. *Spring Valley Wesley Heights Citizens Ass'n v. D.C. Bd. of Zoning Adjustment*, 644 A.2d 434, 437 (D.C. 1994). Petitioners argue that the BZA erred in summarily dismissing their appeal relating to the November permit (which was timely filed) because they had not been given proper notice that the matter would be heard at the May 25 hearing, and they were not afforded an opportunity to present evidence at an evidentiary hearing. We conclude that the BZA could dispose of one of the claims as a matter of law, but

---

4. At the May 25 hearing, Chairperson Griffis noted that Dr. Chiapella, who lives by the Sunrise facility, "could have seen the construction actually happen."

5. Chairperson Griffis observed: "All right. We'll grant you that one. It's an exceptional circumstance working with the ANC. Okay." We note that ANC support may be desirable, but is not necessary to file an appeal. Moreover, the ANC could have supported the appeal after it had been filed.

6. Subsection (f) of the statute reads in its entirety:
 Appeals to the Board of [Zoning] Adjustment may be taken by any person aggrieved, or organization authorized to represent such person, or by any officer or department of the government of the Dis-

trict of Columbia or the federal government affected, by any decision of the Inspector of Buildings granting or refusing a building permit or granting or withholding a certificate of occupancy, or any other administrative decision based in whole or in part upon any zoning regulation or map adopted under this subchapter. The Mayor of the District of Columbia may require and fix the fee to be charged for an appeal, which fee shall be paid, as directed by said Mayor, with the filing of the appeal; provided, that no citizens' association, or association created for civic purposes and not for profit shall be required to pay said fee. *There shall be a public hearing on appeal.*
D.C.Code § 6–641.07(f) (emphasis added).

agree with petitioners that they were entitled to prior notice and an evidentiary hearing on their other claims.

### 1. *Whether the trash room is an "accessory building"*

■ One of petitioner's challenges to the November permit is that the Sunrise facility's trash room impermissibly protruded into the rear yard, reducing the yard space below the minimum amount of rear yard space required for the facility, which is in an R–5–D Zone. *See* 11 DCMR § 404.1.[7] The regulations also require that "accessory buildings," defined as "subordinate building[s] located on the same lot as the main building, the use of which is incidental to the use of the main building[s]," 11 DCMR § 199, *must* be located in the rear yard. *See* 11 DCMR § 2500.[8] The Board concluded that the trash room is an "accessory building," and therefore could not "impermissibly" extend into the required rear yard space, because it has to be located there.[9]

At the May 25 hearing, petitioners did not contest that the use of the trash room conforms to the definition of an accessory building because it is "incidental to the use of the main building." 11 DCMR § 199. Instead, they argued that because they share a "common wall," the trash room is part of the main residential building and therefore should not be deemed an "accessory building" within the definition in the regulation. The question before the Board, therefore, was whether in order to qualify as an "accessory building," a structure has to be physically detached from the main building. As this is a question of law, requiring interpretation of the regulation, an evidentiary hearing was not required. *See Spring Valley Wesley Heights Citizens Ass'n,* 644 A.2d at 437. We therefore reject petitioners' contention that the Board erred in deciding the issue at the May 25, hearing.

With respect to the merits of petitioners' claim that the trash room is not an "acces-

7. 11 DCMR § 404.1 provides in relevant part: A rear yard shall be provided for each structure located in a Residence District, the minimum depth of which shall be as set forth in the following table:

| ZONE DISTRICT | MINIMUM DEPTH OF REAR YARD |
| --- | --- |
| R-1-A, R-1-B | 25 feet |
| R-2, R-3, R-4, R-5-A | 20 feet |
| R-5-B, R-5-C, R-5-D | 4 inches per foot of vertical distance from the mean finished grade at the middle of the rear of the structure to the highest point of the main roof or parapet wall, but not less than 15 feet. |
| R-5-E | 3 inches per foot of vertical distance from the mean finished grade at the middle of the rear of the structure to the highest point of the main roof or parapet wall, but not less than 12 feet. |

8. 11 DCMR § 2500.2 provides:
An accessory building shall be located only in a rear yard, except as follows:
(a) An accessory private garage may be located in a side yard pursuant to § 2300; and
(b) A pump island canopy and any kiosk adjacent to the pumps used exclusively as an attendant's shelter of a gasoline service station may be located in any open area of a lot not within twenty-five feet (25 ft.) of a Residence District unless separated therefrom by a street or alley.

9. Implicit in the BZA's conclusion is that if an accessory building is required to be in the rear yard, the space occupied by the accessory building is not taken into account in calculating whether the rear yard meets the minimum depth requirements. As none of the parties addresses this issue, we do not decide whether such an interpretation is reasonable.

sory building" because it shares a common wall with the main residential building, our deferential standard of review requires us to affirm the BZA's interpretation. *See Bannum, Inc.,* 894 A.2d at 429. The regulations are silent as to whether a necessary condition of an "accessory building" is its complete physical separation from the main building. Petitioners have not cited to any statement in the legislative history of the statute or regulation to support that rooms abutting or adjacent to a main building cannot be considered "accessory buildings," even where their use is incidental to the main building, as they concede is the case here. The BZA is in the best position to interpret the regulations it is charged with implementing, and absent any reasons grounded in the language of the statute or regulation or their legislative history that accessory buildings must be completely detached, we defer to the BZA's reasonable interpretation. The BZA reasoned that the Sunrise facility's trash room is "not part of the building. It has a roof that was constructed at grade level." As the BZA's interpretation of its regulation is reasonable, and its application here is supported by substantial evidence, we have no reason to question its determination that the Sunrise facility's trash room is an "accessory building."

### 2. *The FAR Claim*

■ We reach a different conclusion with respect to petitioners' claim that the Sunrise facility, as its plans developed over time, exceeded the FAR allowed by the regulations. At the May 25 hearing, Dr. Chiapella insisted that based on the information she had at the time, the addition of the trash room increased the facility's FAR in excess of that permitted in the regulations. She conceded, however, that she did not have the precise measurements and calculations. The question whether addition of the trash room resulted in a FAR beyond the allowable amount is a question of fact, and petitioners were entitled to present evidence to support their claim at an evidentiary hearing. *See* D.C.Code § 6–641.07(f); *cf. Spring Valley Wesley Heights Citizens Ass'n,* 644 A.2d at 437. The BZA had announced that only the motion to dismiss would be resolved at the May 25 hearing, and that the merits of the claims would be addressed at another time if it became necessary.[10] Therefore, at that hearing the petitioners did not come prepared—as Dr. Chiapella noted— to present evidence to support their claim. *See Carroll v. District of Columbia Dep't of Employment Services,* 487 A.2d 622, 623 (D.C.1985) ("In general, an individual is entitled to fair and adequate notice of administrative proceedings that will affect his rights, in order that he may have an opportunity to defend his position."); *Public Serv. Comm'n of Kentucky v. FERC,* 365 U.S.App.D.C. 53, 61, 397 F.3d 1004, 1012 (2005) ("The Due Process Clause and the APA require that an agency setting a matter for hearing provide parties with adequate notice of the issues that would be considered, and ultimately resolved at the hearing ... This requirement ensures the parties' right to present rebuttal evidence on all matters decided at the hearing.") (internal quotation marks and citations omitted). Even without such notice, peti-

---

**10.** At the outset of the hearing on May 25, the BZA's Chairperson confirmed Dr. Chiapella's understanding that the only matter to be decided that day was the motion to dismiss:

> Dr. Chiapella: We left [this hearing] at an hour at most for deciding the motion to dismiss.

> Chairperson Griffis: That's right.
> Dr. Chiapella: And rescheduling if the motion failed, is that correct? . . . .
> Chairperson Griffis: That's right.

tioners attempted to answer the BZA's request for more specificity by 1) setting out the permissible FAR (3.5) in the R–5–D Zone where the facility is located, *see* 11 DCMR § 402.4; 2) pointing out that the original floor space of the facility, at 80,870 square feet, resulted in a FAR of 3.49, which left less than seven square feet available; and 3) noting that a "wall test" indicated that the trash room added 114 square feet.[11] They added that these representations were made as a proffer, and requested a full evidentiary hearing at which NANA's zoning expert and architect would testify and provide greater specificity. On this record the BZA could not dismiss petitioners' FAR claim without conducting a further hearing that would afford an opportunity to establish the factual basis for their claim that the Sunrise facility exceeded the permissible FAR.[12] For that reason, this case must be remanded to the BZA for a hearing at which

petitioners have an opportunity to present evidence on that issue.

### 3. *The Loading Berth and Loading Dock*

■ In their appeal of the November permit, petitioners also alleged that the facility did not have the amount of loading space required by the municipal regulations. *See* 11 DCMR § 2201. The BZA was required to address this claim, but its final order was silent on the issue. *See Levy*, 570 A.2d at 740. Accordingly, on remand, the BZA should also consider petitioners' claim that as a result of the granting of the November permit, the facility has insufficient loading space.[13]

We affirm the BZA's dismissal of petitioners' appeal of the August 25, 2003 permit. We remand the appeal of the November 7, 2003 permit to provide petitioners with an opportunity to present ev-

11. We express no opinion on the accuracy of these calculations.

12. To the extent that the BZA relied on a concept analogous to pretrial dismissal for failure to state a claim under Superior Court Civil Rule 12(b)(6), its decision to dismiss the FAR claim because it was not "particulari[zed]" was legally erroneous. "Rule 12(b)(6) tests only the legal sufficiency of the complaint[, and] [d]ismissal is warranted under this rule only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Atkins v. Industrial Telecommunications Ass'n*, 660 A.2d 885, 887 (D.C.1995) (internal quotation marks and citations omitted). On the face of the appeal of the November permit, petitioners alleged that the addition of the trash room to the facility resulted in an illegal FAR under the municipal regulations. Moreover, at the May 25 hearing, Dr. Chiapella maintained that although she did not have the precise measurements, prior to the addition of the trash room, only a small amount of available floor area remained, and it was likely that the addition of the trash room resulted in an illegal FAR. Therefore, taking the allegations as true, as required in

reviewing the sufficiency of a complaint under Rule 12(b)(6), *see Washkoviak v. Student Loan Marketing Ass'n (Sallie Mae)*, 900 A.2d 168, 177 (D.C.2006), petitioners alleged facts which, if proven, stated a claim that would entitle them to relief by the BZA.

13. Because we are remanding with instructions to specifically consider the question whether the facility has sufficient loading space, we need not address petitioners' claim that the BZA erred in failing to give "great weight" to ANC 3/4G's concern about the amount of loading space. See *Levy*, 570 A.2d at 746 ("Issues raised before the BZA by an ANC are accorded special status. The BZA is required by the D.C.Code and its own regulations to give issues and concerns raised by the ANC great weight, and to discuss those issues in the written rationale for the governmental decision taken ... [and] failure to address ANC concerns with particularity is grounds for a remand even if other procedural requirements are met."). ANC 3/4G specifically alleged that "[a]n electrical transformer ... has been placed in one of the two required loading spaces." We are confident that on remand the BZA will accord due consideration to the ANC's concerns.

idence with respect to their FAR and loading space claims.

*So ordered.*