*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-0483

MINNIE ELLIOT, PETITIONER,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION,
RESPONDENT,

and

MID-CITY FINANCIAL CORPORATION, BRENTWOOD ASSOCIATES LIMITED
PARTNERSHIP, and MCF BRENTWOOD VILLAGE SC, LLC,
INTERVENORS.

On Petition for Review of an Order of the
District of Columbia Zoning Commission
(ZC Case No. 14-18)

(Argued September 26, 2019                    Decided March 4, 2021)

*Will Merrifield*, with whom *Akela Crawford* was on the brief, for petitioner Minnie Elliot.

*Alana V. Rusin*, with whom *Paul A. Tummonds* and *David A. Lewis* were on the brief, for intervenors Mid-City Financial Corporation, Brentwood Associates Limited Partnership, and MCF Brentwood Village SC, LLC.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, filed

a Statement in Lieu of Brief for respondent District of Columbia Zoning Commission.

Before GLICKMAN, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: Minnie Elliot challenges the District of Columbia Zoning Commission's Order 14-18A, approving plans to redevelop a 20-acre property that contains the Brookland Manor apartments, where she currently resides. Specifically, she asks this court to review and reject an order approving a second-stage Planned Unit Development ("PUD") application by the developer, Mid-City Financial Corporation ("Mid-City"), regarding one of eight "blocks" of the project, "Block 7." No appeal was taken from the first-stage PUD order which, because of the public benefit it would provide in the form of affordable housing, approved the project in general concept. This is only the first second-stage PUD application for the project to be approved by the Zoning Commission; at least three more second-stage PUD applications are anticipated to complete the development.

In her arguments to this court, Ms. Elliot expressess an overarching concern regarding tenant displacement and the ability of current Brookland Manor residents—the majority of whom live in some form of publicly subsidized housing—to remain on site through and following the development's construction. She disputes that this second-stage PUD order either complies with the intent and

purposes of the first-stage PUD order or is consistent with the District's Comprehensive Plan for future growth and development. In addition, she raises a number of issues related to the second-stage PUD approval process for Block 7, including the Commission's consideration of certain post-hearing evidence and its refusal to consider certain claims.

Ms. Elliot's concerns for the future are understandable. But we see no greater cause for her concerns now than after the first-stage PUD approval. Indeed, because the Commission has both clarified and strengthened certain obligations related to Mid-City's provision of affordable housing and minimization of displacement, and signaled its continuing commitment to monitor these issues, we see less. As we are also unpersuaded by her process arguments, we affirm the Commission's order approving Mid-City's second-stage PUD application for Block 7.

## I.    Regulatory Framework[1]

Planned Unit Developments approved by the Zoning Commission allow larger tracts of land in the District to be developed in a manner not possible under standard zoning regulations in return for the creation of certain public benefits or amenities.  *See Howell v. District of Columbia Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014); *Watergate E. Comm. Against Hotel Conversion to Co-op Apts. v. District of Columbia Zoning Comm'n*, 953 A.2d 1036, 1040 (D.C. 2008).  The PUD approval process requires the Zoning Commission to engage with the developer and impacted stakeholders to ensure the proposed development "(a) [r]esults in a project superior to what would result from the matter-of-right standards; (b) [o]ffers a commendable number or quality of meaningful public benefits; and (c) [p]rotects and advances the public health, safety, welfare, and convenience, and is not inconsistent with the Comprehensive Plan."[2]  11-X D.C.M.R. § 300.1 (2021).

---

[1]  The first-stage PUD order in this case was issued in 2015.  The regulations were subsequently amended in 2016, and the Commission applied the amended regulations when it reviewed and approved the second-stage PUD application.  Because neither party took issue with this approach, we cite exclusively to the regulations as amended in 2016.

[2]  "The Comprehensive Plan, first adopted in 1986 and amended in 2006, establishes a broad framework intended to guide the future land use planning decisions for the District."  *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1162 n.1 (D.C. 2013) (internal quotation marks omitted).  "[A]mong other

"[P]ublic benefits" include by definition affordable housing and senior housing. 11-X D.C.M.R. § 305.5(f)(2), (g) (2021). The developer has the burden of proof to justify approval of the PUD by the Zoning Commission. 11-X D.C.M.R. § 304.2 (2021).

A developer may seek approval of a PUD by means of a "one-stage, consolidated, or a two-stage application." 11-X D.C.M.R. § 302.1 (2021). The two-stage process is useful for larger or more complex projects, and, as in this case, a project may be broken down into multiple second-stage PUDs.[3] When this approach is taken, the Commission will use the first-stage application to conduct a "general review" and assess:

> the site's suitability as a PUD and any related map amendment; the appropriateness, character, scale, height, mixture of uses, and design of the uses proposed; and the compatibility of the proposed development with the Comprehensive Plan, and city-wide, ward, and area plans of the District of Columbia, and the other goals of the project . . . .

things, [it] [d]efine[s] the requirements and aspirations of District residents and [g]uide[s] executive and legislative decisions on matters affecting the District and its citizens." *Id.* (internal quotation marks omitted) (citing D.C. Code § 1-306.01(b)(1), (2) (2016 Repl.)).

[3] *See* District of Columbia Office of Zoning, *Zoning Handbook:* Planned Unit Development (2021), D.C. Office of Zoning https://handbook.dcoz.dc.gov/zoning-rules/general-procedures/planned-unit-developments/ https://perma.cc/3WUF-T6WV.

11-X D.C.M.R. § 302.2(a) (2021). The Commission must receive input from a variety of government agencies, foremost among them the Office of Planning, and hold a public hearing before granting approval of a first-stage PUD. 11-X D.C.M.R. § 308.1–2 (2021). Any first-stage approval order must "state in detail the elements, guidelines, and conditions that shall be followed by the applicant in the second-stage application." 11-X D.C.M.R. § 309.1 (2021).

At the second stage, the Commission will review a detailed site plan "to determine transportation management and mitigation, final building and landscape materials[,] and compliance with the intent and purposes of the first-stage approval[] and [the zoning regulations]." 11-X D.C.M.R. § 302.2(b) (2021). If "a second-stage application complies with all of the requirements of the first-stage approval," 11-X D.C.M.R. § 308.3 (2021), the Commission must again obtain input from various agencies and hold a public hearing. 11-X D.C.M.R. §§ 308.3–4 (2021). If the Zoning Commission, having employed this process, finds the second-stage application "to be in accordance with the intent and purpose of the Zoning Regulations, the PUD process, and the first-stage approval, the . . . Commission shall grant approval to the second-stage application, including any guidelines, conditions, and standards that are necessary to carry out the Zoning Commission's decision." 11-X D.C.M.R. § 309.2 (2021).

## II.     Factual and Procedural History

### A.     First-Stage PUD Approval

In October 2014, Mid-City[4] filed a first-stage PUD application and Zoning Map amendment application for a large-scale redevelopment of a twenty-acre site in the Brookland/Brentwood neighborhood of Northeast D.C., which it renamed the "RIA" development. The site housed the Brookland Manor Apartments, which were built in the 1930s and 1940s, and the Brentwood Village Shopping Center.

The Brookland Manor Apartments had 535 one- to five-bedroom apartments, 490 of which were occupied during the first-stage hearings before the Commission. Of the 535 apartments, 373 were Section 8 "project-based"[5] "affordable"[6]

---

[4]     Mid-City Financial Corporation, Brentwood Associates Limited Partnership, and MCF Brentwood Village SC, LLC intervened in this case; we use "Mid-City" in this opinion to refer to all intervenors as a group.

[5]     *See* 24 C.F.R. § 982.1(b)(1) (explaining that Section 8 assistance may be "project-based" or "tenant-based," and that with the former, "rental assistance is paid for families who live in specific housing developments or units," whereas with the latter, "the assisted unit is selected by the family," who "may rent a unit anywhere in the United States in the jurisdiction of a [public housing authority] that runs a voucher program").

[6] "Affordability" is a term of art that is tied to the income level of the housing consumer. The District of Columbia Housing Authority ("DCHA") sets various income levels based on the Area Median Income ("AMI"). A household that earns

apartments—meaning the units themselves were subsidized by government funds.[7] The remaining units were market rate apartments, mostly occupied by tenants who possessed Section 8 Housing Choice Vouchers[8] ("HCVs") that covered some portion (if not all) of the monthly rent.

Mid-City asked to redevelop this site by tearing down the existing buildings and constructing in their place 1,760 residential units, including senior housing, multi-family apartments, and town homes, as well as a community green space and retail space. Mid-City's stated objective was to "create a truly mixed-income and mixed-age residential community." It committed "that 22% of the residential units included in the PUD project [would] be reserved as affordable housing" and that it

---

no more than 80% of the AMI is defined as "low income"; a household that earns 30% or less of the AMI is defined as "extremely low income." *See* D.C. Code §§ 6-201(19A); (28) (2018 Repl.). In approving the first-stage PUD, the Commission ordered that if the development's Section 8 contract with DCHA remained in effect, 373 units would be set aside for families or individuals whose income fell "significantly" below 50% of the AMI, which the Commission and the parties also referred to as "deep[ly]" affordable although that terminology does not appear in the regulations. We understand these 373 units to be set aside for residents earning 30% or less of the AMI because only "extremely low income" residents qualify for project-based assistance in the District. *See* D.C. Code § 6-227(c) (2020 Supp.).

[7] Such "project-based" affordable housing will not travel with the tenant should the tenant chose to move. *See supra* note 5.

[8] Individuals with these vouchers may use them to rent property of their choosing, subject to some qualifications. Unlike a project-based subsidy, a voucher travels with the tenant. *See supra* note 5; *see also* 24 C.F.R. §§ 982.1(a), (b).

would "work[] with the existing residents of the Brookland Manor community to create a workable and effective Tenant Relocation Plan so that those residents can participate in the new . . . community."

The Commission held public hearings on the project, in accordance with 11-X D.C.M.R. § 308.2, and granted opposition party status to the Brookland Manor Residents Association; in her capacity as the Association's president, Ms. Elliot, a voucher holder who lives in the community with her extended family, testified on its behalf. The Residents Association, the Office of Planning, the affected Advisory Neighborhood Commissions, and other community members raised concerns about the total number of affordable housing units, the continued availability of housing to accommodate large families living in four- and five-bedroom units, and displacement, temporary as well as permanent, of current residents. As a result, the Commission pressed Mid-City about these issues at the hearing and requested additional, more detailed information from Mid-City after the hearing, which Mid-City provided.

The Commission subsequently issued Order Number 14-18 approving Mid-City's first-stage PUD application. In its 66-page order, the Commission detailed the public benefits the project would be obligated to provide. Foremost among these

benefits was the provision of affordable housing. The Commission acknowledged that the Office of Planning and the Residents Association had asked Mid-City to designate as affordable 535 of the proposed 1,760 new units so as to provide one-to-one replacement of the affordable housing provided by Brookland Manor. But the Commission declined to require this of Mid-City. The Commission explained it only considered the existing 373 Section 8 project-based apartments in Brookland Manor to be "affordable." It excluded from this definition the remaining units, because they were rented for market-rate, even though in most cases the residents of these units paid their rent with the assistance of a voucher. Accordingly, the Commission determined that Mid-City's "decision to retain the Section 8 contract on the Subject Property and provide 373 units of housing for residents who make significantly less than 50% of AMI" alone was "a significant project amenity of this first-stage PUD application."

Even so, the Commission required more of Mid-City. Specifically, it directed in Condition B.1.a that "[f]or so long as the project exists," and assuming the Section 8 contract remained,[9] Mid-City "shall provide the following affordable housing:"

---

[9] At the time the parties briefed this case in 2018, Mid-City represented that it had an agreement with the Department of Housing and Urban Development to renew the Section 8 contract on a yearly basis while this appeal was pending.

(1) There shall be at least 384 affordable units, of which 373 shall be Section 8 units and 11 shall be 'inclusionary units'[10] within the meaning of 11 DCMR § 2602;

(2) Of the 373 Section 8 units, 150 to 200 of such units shall be in the Senior Building, which shall contain no other type of unit;

(3) The remaining Section 8 units shall be in the multi-family buildings; provided that, at least 10% of each multi-family building's units shall be the Section 8 units; and

(4) The 11 inclusionary units shall be either townhouses or two-over-two units . . . [and] [s]ix of the inclusionary units shall be reserved for households earning no more than the 50% of the AMI and five of the inclusionary units shall be reserved for households earning no more than 80% of AMI[.]

In its first-stage PUD approval, the Commission also addressed the size of the apartments to be constructed. The Commission acknowledged the Residents Association's argument that Mid-City should be required to provide four- and five-bedroom apartments to replicate the range of apartment sizes in Brookland Manor and accommodate its residents with larger families. But, based on Mid-City's research that no developers of similar multi-family developments were constructing units of that size either in D.C. or anywhere else in the United States, as well as Mid-City's representations that building replacement apartments with four or more bedrooms would not be economical and would adversely impact the community at

---

[10] "Inclusionary" is defined by the zoning regulations as "a unit set aside for sale or rental to an eligible low- and moderate-income household." 11 D.C.M.R. § 2601 (2021).

large, the Commission concluded that the construction of larger apartments was "not necessary."

Lastly, regarding the general concerns of displacement, the Commission expressly acknowledged in its factual findings that Mid-City had made commitments "to retain the Section 8 contract on the property in perpetuity," and to give "anyone with a DCHA Housing Choice Voucher . . . the opportunity to remain," and to provide to "all residents in good standing . . . the opportunity to return." In its conclusions of law, the Commission determined that Mid-City's plan to relocate current residents on site in order to minimize the displacement effects of ongoing construction was "a commendable public benefit" that "appropriately addresse[d] the concerns raised by the Residents Association." And it "recognize[d]" Mid-City's commitment "to allow all households that reside at Brookland Manor at the commencement of the redevelopment in early 2018 . . . the right to return to the new Brentwood Village community." But beyond directing Mid-City to abide by the terms of its tenant relocation and construction phasing plan, the first-stage PUD order did not specifically impose any additional obligations on Mid-City to prevent or minimize displacement.

The first-stage PUD order outlined how the project would proceed in multiple phases: Phase 1 – Development of Block 7; Phase 2A – Development of Blocks 2 and 3; Phase 2B – Development of Blocks 5, 6, and 8; and Phase 3 – Development of Blocks 1 and 4. The order detailed the information Mid-City would need to give the Commission with each second-stage PUD application. The first-stage order became final in November 2015. No party or individual appealed the first-stage order.

## B.      Second-Stage PUD Approval for Block 7

In September 2016, Mid-City submitted a second-stage PUD application for "Block 7" of the Brookland Manor complex. At the time of the application, the area comprising Block 7 contained three apartment buildings containing a total of 64 apartment units. These buildings have since been demolished and all tenants living in Block 7 buildings (including apparently Ms. Elliot and her family) were relocated to other existing Brookland Manor apartment units at Mid-City's expense.

As described in the first-stage PUD proceedings, the plan for Block 7 was to construct a senior building of up to 200 units, an 86-unit market-rate multi-family building, and 28 for-sale "two over two" or townhouse units. In its application for a first-stage PUD modification and second-stage PUD approval, Mid-City requested

that Block 7 instead include a 200-unit senior building, a 131-unit multi-family building, and no townhouses, with corresponding changes to the location, size, and design of the buildings in this block.[11]  Mid-City did not request any change to the affordable housing conditions set forth in the first-stage order, except for flexibility in the allocation of affordable units in each building during construction, which would later be re-allocated to ensure that no building in the final project had a permanent disproportionate concentration of low income units.

The Commission held public hearings on the Block 7 second-stage PUD application in the first half of 2017.  In opposition to this second-stage PUD application, the Residents Association (which was again granted party status) "raised a number of interrelated issues concerning the affordable housing provided in the Project" as a whole, including the "number of subsidized replacement units to house the likely number of existing residents"; the "displacement as a result of splitting families and housing seniors in the senior building"; the fact that the project "[did] not include a subsidy for current residents who are DCHA Section 8 voucher

---

[11]  These changes necessitated additional relief from the zoning regulations not contemplated in the first-stage PUD order and prompted the application for modification of that order.  No appeal has been taken from the order granting this modification and we discuss the modification of the first-stage PUD order only as it relates to Ms. Elliot's challenges to the order approving the second-stage PUD application for Block 7.

holders"; and alleged actions taken by Mid-City to force current residents to leave Brookland Manor before the commencement of the project. The Commission asked Mid-City for additional information to address these concerns.

In its responsive supplemental post-hearing submissions, Mid-City reiterated its commitments, made at the first-stage PUD proceedings, both to retain the Section 8 project-based contract for 373 apartments on the property as a whole, and to ensure that "[a]ll households in good standing that reside at Brookland Manor . . . will be provided the opportunity to remain at the property through and following the redevelopment process." Mid-City noted, however, that this second-stage PUD application only applied to Block 7, which by May 2017 was vacant, all its residents having been relocated to buildings in other blocks on the site.

In response to concerns about the availability of affordable housing in Block 7, Mid-City explained that approval of this second-stage PUD would create "up to 331 replacement affordable housing units," not all of which would be subtracted from the required total of 373 Section 8 project-based apartments for the entire development. Specifically, 200 of these units would be in the senior building, which would be "100% occupied by residents [62 and older] who will be assisted by the project[-]based *and* voucher Section 8 programs." Although current senior residents

of Brookland Manor (which Mid-City estimated to be 167 in number) would have the first opportunity to move into this building, seniors from outside the community who possessed Housing Choice Vouchers would have the opportunity to move into any units not claimed by current senior residents. As a result, Mid-City anticipated that some number of the 373 Section 8 project-based apartments could be redistributed elsewhere in the development, likely making "the effective affordable housing commitment for the redevelopment . . . greater than the 373 units required" under the first-stage PUD order.[12]

Addressing the concerns about splitting up multi-generational families and possible displacement of large families, Mid-City explained that all resident seniors would be eligible to live in the senior building but could opt to live in a multi-family building if that was their preference. Mid-City further explained that large households could continue to live on site in Blocks 1 and 4 (where the preponderance of existing large apartments are located) until the final phase of the project, at which time Mid-City would work with the families to ascertain their "needs and

---

[12] Mid-City also noted that the multi-family building in Block 7 would contain 131 units, 65 of which would be temporarily designated affordable during construction and 25 of which would be permanently designated affordable once construction was complete.

preferences" and "house them appropriately according to Section 8 program requirements."[13] Mid-City also committed to providing the Commission with "updates . . . on the status of these households in each subsequent [s]econd-[s]tage PUD application."

In response to concerns that current resident voucher holders might be priced out of the new development, Mid-City acknowledged that beyond the project-based Section 8 apartments and the inclusionary units, the remainder of its housing would be rented at market rate. While noting that voucher holders had a portable subsidy that theoretically gave them flexibility to rent elsewhere in the metropolitan area, Mid-City conceded their options might be more limited in reality because DCHA's "HCV rent payment standard does not allow its clients to live in most of the District's submarkets." Mid-City reasserted its commitment to "retaining [voucher holder] residents on site through the build-out," specifically by "work[ing] with the Resident Association, DCHA, and D.C. Public Officials to ensure that the future HCV payment standard for the . . . neighborhood is sufficient to cover the future market rate rent levels for these residents." Mid-City noted, however, that "the issue of

---

[13] Mid-City noted that the townhome component of the development (relocated to other blocks) would provide three- and four-bedroom housing units, be subject to the District's strict inclusionary zoning requirements, and could possibly be an option for larger families.

HCV increases [did not] need [to] be fully resolved until the existing Brookland Manor Buildings are no longer available," which it projected would not be the case for "a decade or more into the future." Accordingly, Mid-City asserted that "resolution depend[ed] largely on DCHA financing plans in years beyond DCHA's current planning horizon," but should not present a "barrier to commencing the first phase of Block 7 (which is a necessary predicate to future phases)."

Lastly, Mid-City acknowledged there had been "natural attrition" due to the movement of tenants seen in "every apartment community," and that it was not entering into new leases. But it explained that it had foregone income "to provide for the opportunity for resident relocations [during development] to take place on site." Mid-City "strenuously object[ed] to any argument that it [had] undert[aken] a concerted campaign to remove or displace its current residents" prior to commencement of the project.

The Commission accepted Mid-City's explanations and resolved all "contested questions" in favor of Mid-City. In particular, it reaffirmed that the overall project provided "a valuable public benefit" in the form of affordable housing that was "unchanged" from the amount of affordable housing required by the first-stage PUD order. The Commission acknowledged that language in the first-stage

PUD order reasonably might have caused some confusion about the distribution and amount of affordable housing to be provided.  It pinpointed Condition B.1.a(2)[14] as the source of concern that all 200 units of the Senior Building in Block 7 would be designated as project-based units, thereby taking up a significant portion of the allocated 373 project-based units for the entire project and leaving an insufficient number of project-based units to distribute elsewhere in the development for non-senior residents and residents with larger families.  The Commission explained that this reading of Condition B.1.a(2) was incorrect:  The Senior Building would be "reserved for residents . . . who will be assisted by the project[-]based *and/or* HCV Section 8 programs," with first priority going to existing residents of Brookland Manor and the balance open to senior voucher holders from outside Brookland Manor.  Seniors already living with families in a project-based unit in Brookland Manor could opt to forgo a spot in the Senior Building and live in a project-based unit in a multi-family building in the new development if that was their preference; in such a case, "the available slot in the senior building [would] be filled with an eligible senior utilizing HCV vouchers."  Thus, the Commission concluded that

---

[14]  The Commission referred to language obligating Mid-City to provide 373 Section 8 project-based apartments (if it retained the Section 8 contract) and that of those 373 units, "150 to 200 . . . shall be in the Senior Building, which shall contain no other [type of] unit[]."

"there w[ould] be more than 373 'Section 8' units"—a combination of project-based and voucher-subsidized apartments—"in the redevelopment."[15] It amended Condition B.1.a(2) of the first-stage PUD order to make this clear.

The Commission rejected the other critiques of the project as a whole. Separate and apart from the Residents Association's concerns about the overall quantity and distribution of affordable housing, the Commission explained that objections related to inadequate accommodation of tenants living in four- and five-bedroom apartments, and of families with senior residents, had "no relationship" to the second-stage PUD application. Relevant conditions related to those residents imposed by the first-stage PUD order were "unchanged," and Mid-City had provided "sufficient assurance" that these residents would not be displaced, or if any were, displacement would not defeat the public benefit of the project.

The Commission also rejected the argument that the second-stage PUD application for Block 7 should be denied because of the lack of assurance from Mid-

---

[15] In its second-stage PUD order, the Commission clarified that it anticipated some number of voucher holders would live in the multi-family building in Block 7: the Commission directed Mid-City to reserve "[f]or the life of the Project" a minimum of 25 units in the multi-family building in Block 7 for residents "assisted by the project-based *and/or* HCV Section 8 programs," which would "be used to house existing Brookland Manor residents as demand dictates, subject in all instances to Condition B.1 of the First Stage Order."

City that voucher holders would be able to afford to rent in the new development. The Commission explained that the first-stage PUD order imposed no obligation on Mid-City "to ensure that the subsidy provided through the DCHA HCV program is sufficient to cover the future market rate level for the Project." Lastly, the Commission determined that it was premature to address general concerns about displacement in this second-stage PUD application. But it also explained, echoing earlier statements, it "d[id] not believe" any displacement would occur, and if it did, it would be "acceptable given the quality of the public benefits of the Project."

Even so, the Commission amended Condition B.2 of the first-stage PUD order and reiterated in Condition B.3 of the second-stage PUD order that Mid-City was required to "abide by" its tenant relocation and construction management plan, which included its commitment to give current residents "the opportunity to remain at the property through and following the redevelopment process." It further ordered that "[a]ll tenant relocations will occur on the RIA site," and that "in connection with *any* subsequent second[-]stage application arising out of the First-Stage Order, [Mid-City] shall provide an update on the allocation of affordable housing units throughout the redevelopment site and the remaining Brookland Manor buildings, as applicable."

Based on these findings and with these amendments to the first-stage PUD order, the Commission determined that Mid-City's second-stage PUD application for Block 7 "complie[d] with the intent and purposes of the first[-]stage approval and the Zoning Regulations, including its commitment to provide an opportunity for all households in good standing that reside at Brookland Manor at the commencement of the redevelopment in early 2018 to remain at the property through and following the redevelopment process." The order approving the second-stage application for Block 7, Order Number 14-18A, became final on April 13, 2018. *See* 11-Z D.C.M.R. § 604.9 (2021). This appeal followed.[16]

### III. Analysis

### A. Standing and Timeliness

Mid-City challenges Ms. Elliot's standing to appeal any aspect of the Commission's second-stage PUD order because she "cannot credibly allege" individualized injury "as a result of the Block 7 PUD." Mid-City specifically notes that Ms. Elliot has already been relocated from Block 7 to another apartment within

---

[16] Before it filed its petition for review, the Residents Association filed a "Motion for Reconsideration," which Mid-City opposed and the Commission denied. Ms. Elliot did not seek to appeal this Order.

Brookland Manor. Be that as it may, as a voucher holder and head of a multi-generational family currently residing on site, Ms. Elliot's residence in that apartment is temporary (she will have to move when the Block where that apartment is located is developed), and to the extent she fears that her ability to remain as a resident on the property in the future is endangered by the Commission's second-stage PUD order for Block 7, she is personally "adversely affected or aggrieved," D.C. Code § 2-510(a) (2016 Repl.), such that she has standing to litigate this appeal. *See York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1079, 1084 (D.C. 2004) (explaining a litigant has constitutional standing when they have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," and they satisfy "prudential principles of standing" if they assert their "own legal rights," not the rights of others (internal quotation marks omitted)).[17]

Mid-City also asks this court to dismiss Ms. Eilliot's appeal as untimely under D.C. Court of Appeals Rule 15 and barred by the doctrine of laches because, in its

---

[17] We agree that Ms. Elliot does not have standing to challenge the Commission's fact-finding regarding the renewal of the Section 8 project-based contract, and thus we do not address her arguments on this point. *See id.* (acknowledging a litigant's standing in a zoning case cannot be based on "generalized grievances").

view, all of her arguments should have been made in an appeal from the first-stage PUD order. Our timeliness analysis under Rule 15 does not extend to the particular arguments a litigant makes in her brief once filed; rather, we examine only whether the petition for review was filed within the timeframe set forth under the rule. *See, e.g.*, *Williams v. District of Columbia Hous. Auth.*, 213 A.3d 1275, 1277 (D.C. 2019). Ms. Elliot filed a petition for review from the Commission's second-stage PUD order and her petition from that order is timely under Rule 15.

Assuming without deciding that Mid-City could assert a laches defense to the substance of the arguments Ms. Elliot makes on appeal,[18] Mid-City did not do so before the Commission. "It is well-settled that generally we will not reverse an agency decision on an issue that the agency never had a chance to consider." *Ungar v. District of Columbia Rental Hous. Comm'n*, 535 A.2d 887, 889 n.5 (D.C. 1987).

---

[18] *See Sisson v. District of Columbia Bd. of Zoning Adjustment*, 805 A.2d 964, 971 (D.C. 2002) (noting that the defense of the doctrine of laches is "judicially disfavored in the zoning context because of the public interest in enforcement of the zoning laws"); *see also Naccache v. Taylor*, 72 A.3d 149, 152–53 (D.C. 2013) (explaining the doctrine of laches is the equitable analogue to a statute of limitations in an action at law, and "does not apply to purely legal claims").

## B. Standard of Review

This Court's review of Zoning Commission Orders, as with all agency decisions, is generally deferential. We examine the order in question to determine if it is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" if the order was issued "[w]ithout observance of procedure required by law[,]" or if it is "[u]nsupported by substantial evidence in the record of the proceedings." D.C. Code §§ 2-510 (a)(3)(A), (D), (E) (2016 Repl.). *See Union Mkt. Neighbors v. District of Columbia Zoning Comm'n*, 204 A.3d 1267, 1269–70 (D.C. 2019). "[W]e must affirm the [Zoning] Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings." *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013).

## C. Ms. Elliot's Arguments Related to Displacement

### 1. Displacement of Voucher Holders

Ms. Elliot's foremost concern is that voucher holders will be displaced by the redevelopment of Brookland Manor, because the Commission in its second-stage PUD order for Block 7 did not require Mid-City to guarantee that they will be able

to afford one of the newly constructed apartments with the subsidy their voucher provides. Ms. Elliot asserts that the failure to include this requirement is inconsistent both with the first-stage PUD order, which approved this redevelopment based on the premise that it would provide affordable housing and would not displace existing residents, and with the Commission's Conditions of Approval of the second-stage PUD order for Block 7, which, inter alia, require Mid-City to abide by its on-site tenant relocation plan.

Ms. Elliot argues that the second-stage PUD order for Block 7 is inconsistent with the first-stage PUD order because it did not require Mid-City to ensure voucher holders will be able to afford apartments in the new development. We disagree. The first-stage PUD order did not contain any guarantee to voucher holders. It only required that, if Mid-City maintained its Section 8 project-based contract, the redevelopment include 373 Section 8 project-based apartments, as well as 11 inclusionary townhouses. Further, although the Commission "recognize[d]" Mid-City's general commitment to allow current residents to return to the redeveloped property in its first-stage PUD order, the order did not condition its approval based on this commitment. More specifically, it did not direct Mid-City to guarantee a right of return for voucher holders (and thus necessarily did not require Mid-City to ensure that voucher holders could afford to pay, with the assistance of their subsidy,

the market-rate rent of the non project-based units in the new development).  To the contrary, in the first-stage PUD order, the Commission expressly rejected the argument made by the Residents Association that Mid-City should be required to provide the same number of affordable units (including both project-based and voucher units) in the new development as currently existed in Brookland Manor.

What is noteworthy, however, is that Mid-City continued in its second-stage PUD application for Block 7 to express its commitment to provide housing for current residents, project-based and voucher-holder alike.  And the Commission, having heard both Mid-City's willingness to accommodate all current residents and some residents' persistent concerns about displacement, imposed new obligations on Mid-City in the second-stage PUD order for Block 7.  Specifically, it required Mid-City to "abide by" the commitments set forth in its tenant relocation and construction management plan, among them the commitment to provide "[a]ll households in good standing that reside at Brookland Manor . . . the opportunity to remain at the property through and following the redevelopment process."  The Commission also ordered Mid-City to "provide an update on the allocation of affordable housing units throughout the redevelopment site and the remaining

Brookland Manor buildings, as applicable," with every subsequent second-stage PUD application.[19]

Ms. Elliot points to these provisions to argue that the second-stage PUD order was internally inconsistent to the extent it also acknowledged no commitment had been made to voucher holders to ensure they would be able to afford to stay in the new development. We discern no inconsistency. The Commission, taking seriously its oversight of a PUD premised on delivery of the public benefit of affordable housing, did not go so far as to require Mid-City to guarantee housing for current Brookland Manor Section 8 voucher holders in the new development, but it indicated that it would monitor the possibility of displacement carefully and might seek at some future second-stage PUD proceeding to impose additional obligations on Mid-City to minimize displacement should that become a concern.

---

[19] Further, as explained *supra* Section II.B, specific to Block 7, the Commission required in its second-stage PUD approval that 265 of the 331 units constructed "be deeply affordable and reserved for occupants eligible to receive Section 8 assistance through [Mid-City's] project based contract with HUD *or . . .* [the] Housing Choice Voucher" program. The Commission also made clear that it anticipated that voucher holders would be housed in the multi-family building in Block 7. *See supra* note 15. And, although not of interest to Ms. Elliot, the Commission expressly clarified that *all* the units in the senior building would be reserved for seniors receiving Section 8 assistance in some form—either through its project-based program or the voucher program.

Ms. Elliot challenges as arbitrary and against the substantial weight of the evidence the Commission's finding that if there was any displacement of voucher holders (which it did not anticipate), this displacement would be acceptable given the public benefits of the project. We are unpersuaded. In addition to reaffirmation of affordable housing requirements and monitoring of displacement discussed above, the Commission explained that upon completion of Block 7 there would be at least 800 units on the property, more than enough to temporarily house all the current residents.[20] The Commission also explained that the number of current residents who would need to be housed at the end of the project and the adequacy of any subsidy from an HCV to cover the market rent was currently unknowable. The Commission's job at this second-stage PUD proceeding was to assess the second-stage PUD for Block 7, not the overall redevelopment. *See* 11-X D.C.M.R. § 302.2(b); see also discussion *supra* Section I. Based on the Commission's reasoning, we conclude that substantial evidence supported its finding regarding displacement of voucher holders.

---

[20] Early in its findings of fact, the Commission acknowledged that all but one resident of Block 7 had already been relocated to other apartments in Brookland Manor, and the one tenant who remained would be relocated prior to the commencement of construction.

## 2. Displacement of Families

Ms. Elliot also challenges as arbitrary and against the substantial weight of evidence the Commission's determination that "the potential displacement of current Brookland Manor residents residing together as large families and family members of intergenerational households headed by a senior citizen[] is acceptable given the overall quality of the public benefits of the project." We disagree. As the Commission noted, the number of affordable units for families, the range of bedroom sizes, and the composition of the senior building had already been approved by the first-stage PUD order, and was unchanged by the second-stage PUD application.[21] The Commission also explained that a senior eligible to live in the senior building who, like Ms. Elliot, preferred to live with their family in another multi-family building could continue to do so. Lastly, as the Commission again noted, the number and size of units needed to house existing large families were as-yet unknowable, but, as Mid-City had represented without contradiction, adequate housing was presently available to large families requiring large units, because the four- and five-bedroom units in the old Brookland Manor buildings were all located on Blocks 1

---

[21] The second-stage PUD order for Block 7 did clarify, however, that the apartments in the senior building would *not* all be project-based, thus allowing for more project-based apartments in the multi-family building. *See also supra* Section II.B.

and 4, which would not undergo construction until at least 2023 as the last phase of the project. Accordingly, the Commission's assessment at the second-stage PUD proceeding for Block 7, that the risk of displacement in the future for large families and families with seniors was de minimis, was rational and adequately supported.

Ms. Elliot argues that the Commission lacked sufficiently detailed demographic information to make this decision, thereby suggesting that the Commission should have assessed the future needs of large families and families with senior residents based on a snapshot of their needs at the time of the second-stage PUD proceeding for Block 7. But given that Block 7 is only the first phase of the overall development, and the expected completion date of the project is years away, we conclude that the Commission's decision to monitor the situation was a reasonable approach.[22]

---

[22] In our review of whether the Commission's assessment of the risk of displacement was rationally based on substantial evidence, Ms. Elliot asks this court to take judicial notice of demographic information contained in expert declarations filed in a separate case litigated in federal court. *See infra* note 26. Ms. Elliot concedes that this information is not part of the Commission's administrative record. Because she has failed to provide us with any authority that supports taking judicial notice of extra record information, we decline to take that step. *See Union Mkt. Neighbors v. District of Columbia Zoning Comm'n*, 197 A.3d 1063, 1068 n.4 (D.C. 2018) (explaining that this court's "review is statutorily limited to the 'exclusive record for decision before the . . . agency'") (quoting D.C. Code § 2-510(a) (2012 Repl.)).

### 3. Compliance with the Comprehensive Plan

Ms. Elliot also challenges the Commission's determination that Mid-City's second-stage PUD application for Block 7 is consistent with the Comprehensive Plan, specifically Housing Element Policy H-1.2.3. This policy seeks to "[f]ocus investment strategies and affordable housing programs to distribute mixed income housing more equitably across the entire city, taking steps to avoid further concentration of poverty within areas of the city that already have substantial affordable housing." 10-A D.C.M.R. § 504.8 (2021). Ms. Elliot argues that the Commission "failed to appropriately address the material contested issues of fact raised" at the second-stage PUD proceeding for Block 7 regarding consistency with this Housing Element. She also argues that the Commission abused its discretion by failing to make its own assessment of this particular concern and instead copying "verbatim" Mid-City's proposed response to this challenge. Accordingly, she asks this court to remand this case back to the Commission "to provide an independent analysis as to how the proposed PUD is not inconsistent with the housing element policies of the comprehensive plan."

To begin with, employing language of its own drafting, the Commission rejected this challenge to Mid-City's second-stage PUD application on the ground that the consistency of the overall project with the Comprehensive Plan "was

conclusively decided in the First-Stage Order." We agree that the Commission was not obligated to revisit an issue already raised and decided during the first-stage proceedings. *See James Fournier v. District of Columbia Zoning Comm'n*, 2021 WL 377845, at \*2 (D.C. Feb. 4, 2021). Still, in "an abundance of caution," the Commission then "analyzed the specific allegations of inconsistency." Regarding Housing Element Policy H-1.2.3, the Commission discerned "no reason," based on the lack of evidence presented at the second-stage PUD proceeding, "to disturb its previous finding" regarding the consistency of the project overall, which would "create a mixed-income community where currently there is a community of concentrated poverty[.]" The Commission likewise discerned no inconsistency between this Housing Element and the development of Block 7, which would "provide[] 225 new, high-quality, permanently and deeply affordable units where currently there are 64 units more than approximately 80 years old." To the extent Ms. Elliot argues that this conclusion was unsupported by the evidence, she relies on arguments, rejected above, that the Commission's second-stage PUD order for Block 7 diminished the availability of affordable housing in the RIA development. And the fact that the Commission relied in large part on language from Mid-City's proposed draft order to address this particular argument does not justify remand.[23]

---

[23] Ms. Elliot alludes to our decision in *Durant v. District of Columbia Zoning Comm'n*, where we expressed concern that the Commission's Order did not

### D.    Ms. Elliot's Procedural and Evidentiary Arguments

### 1. Preclusion of Cross-Examination of Leonard Bogorad

Ms. Elliot argues that the Commission erred by failing to afford the Residents Association with the opportunity to cross-examine Leonard Bogorad, the author of a report, "Analysis of Potential Impact of the RIA Development on Gentrification, Destabilization of Property Values, Displacement, and Employment."  Mid-City submitted the report to the Commission after the public hearings, in response to the Commission's request for additional information on these topics.  The Association moved to strike the report on Due Process grounds, arguing the information should have been presented as live testimony subject to cross-examination, and it alternatively requested that the Commission reopen the hearing to allow such questioning.  But it never indicated on what grounds it would seek to substantively challenge the content of the report, much less proffered any contrary evidence.  Mid-City opposed this motion, arguing that the report constituted a post-hearing

---

"ultimately represent [its] own determinations."  99 A.3d at 257–58 (internal quotation marks omitted).  But the order in that case was "an approximately 99.9% verbatim adoption of the developer's proposed order," typos and all, and "d[id] not mention, much less address, any of" the opposing parties' objections to approval of the PUD being reviewed. *Id.*  Even so, we did not "prohibit the practice of verbatim adoption of orders proposed by one of the parties," much less the reproduction of any language of a proposed order. *Id*. at 257. *Durant* does not compel remand here.

submission,[24] and thus the right to cross-examine a witness testifying at a public hearing[25] did not apply. The Commission denied the Association's motion, determining that the report was properly submitted as part of a post-hearing submission and that the Association was aware of and given an opportunity to respond in writing as contemplated by the regulation. The Commission cited the report in one paragraph of its Findings of Fact regarding the "land value impact" of the second-stage PUD application for Block 7; specifically, the report constitutes the foundation for the Commission's finding that "the Project does not result in unacceptable project impacts on the surrounding area or on the operation of District services and facilities but instead is either favorable, capable of being mitigated, or

---

[24] Once all witnesses have testified and the public hearing or hearings end, the Commission may request post-hearing submissions from the parties, and any party has seven days in which to respond "to any exhibits, information, or legal briefs" contained in another party's post-hearing submission. 11-Z D.C.M.R. §§ 602.1, 602.3 (2021).

[25] *See* 11-Z D.C.M.R. § 203.9 (2021) (when expert testimony is desired, "[a]n expert witness shall be present at the hearing and be available for questions from the Commission and cross-examination by any other party"); *see also* D.C. Code § 2-509 (2016 Repl.) ("Every party shall have the right to . . . conduct such cross-examination as may be required for a full and true disclosure of the facts."); 11-Z D.C.M.R. § 408.7 (2021) ("Every party shall have the right . . . to conduct such cross-examination as may be required for a full and true disclosure of the facts."); 11-Z D.C.M.R. § 403.7(c) (2021) (in a contested case, a party may "[c]ross-examine all other parties and persons testifying in the case"); 11-Z D.C.M.R. § 203.11 (2021) ("In a contested case . . . witnesses may be examined or cross-examined by . . . any party . . . .").

acceptable given the quality of public benefits in the Project." The Commission did not cite to or rely on the report anywhere else in its second-stage PUD order.

We need not decide whether the Commission should have permitted cross-examination of Mr. Bogorad. Even when cross-examination is erroneously denied, this court must review that error for harmlessness. *See Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 44 (D.C. 1992). "[M]athematical certainty [that the error did not affect the result] is not required; fair assurance is sufficient." *Id.* (internal quotation marks omitted). We are confident that even if the disputed ruling had not been made, the Commission would have approved the second-stage PUD for Block 7. As noted above, the Commission relied on the report only in making one factual finding. This single finding out of over 100 addressed only one of a myriad of project impacts (including Housing Impacts, Land Use Impacts, and Design Impacts) that were deemed acceptable or weighed in Mid-City's favor. The Commission separately assessed the public benefits of the project and found they supported the second-stage PUD application for Block 7. And we have been given no reason to believe that had the Commission permitted cross examination, it would have reassessed this impact in such a manner so as to outweigh these public benefits. Ms. Elliot argues that land values bear a relationship to affordability of rental property and displacement, and thus undermine the

Commission's assessment of public benefits. This is no doubt true, but it does not alter our assessment of harm, given the careful consideration the Commission gave to the issue of displacement, *see supra* Section III.C, and its decision to continue to monitor the issue.

## 2. Refusal to Consider Fair Housing Act Compliance

Ms. Elliot challenges the Commission's refusal to consider the compliance of the second-stage PUD application for Block 7 with the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, *et. seq.* As a preliminary matter, Ms. Elliot fails to explain the precise nature of the FHA claims the Commission should have considered, other than to note that at one of the second-stage PUD hearings, an attorney argued that the reduction of large apartments, and specifically the eradication of four- and five-bedroom apartments, "constitutes a disparate impact on families." As discussed above, the unit sizes for the RIA development were set at the first-stage PUD, which neither the Residents Association, Ms. Elliot, nor any other party appealed. Thus, to the extent Ms. Elliot sought to argue that Mid-City should have been ordered to produce affordable housing units with four- or five-bedrooms under the FHA, the Commission could have rejected that claim on the ground that it should have been raised via an appeal of the first-stage PUD order. *See Fournier*, 2021 WL 377845, at *2 (declining to address issues already raised by

parties and decided by Commission at first-stage proceeding). Another impediment to our review is Ms. Elliot's assertion that when the Commission denied reconsideration of its approval of the second-stage PUD application for Block 7, it retracted categorical statements made in the initial order that it had no jurisdiction to address FHA claims and apparently rejected these claims on different grounds. Mid-City disputes Ms. Elliot's characterization of the order denying reconsideration. As explained above, this order is not before us, *see supra* note 16.[26] Without adequate briefing or, according to Ms. Elliot, the operative order, we decline to address this issue.

## IV. Conclusion

In its first-stage PUD order, the Commission approved in general concept Mid-City's redevelopment of the 20-acre site in the District that contains the

---

[26] We note that some Brookland Manor residents pursued a FHA claim in a federal class action alleging that the proposed development's elimination of four- and five-bedroom units had a disparate impact on larger, intergenerational families, thereby discriminating against them on the basis of familial status. The District Court for the District of Columbia granted summary judgment in Mid-City's favor, holding that the plaintiffs had "provided no evidence of a discriminatory disparate impact on the basis of 'familial status,' as defined by the controlling statutes." *Borum v. Brentwood Vill., LLC*, No. CV 16-1723 (RC), 2020 WL 1508906, at *1 (D.D.C. Mar. 30, 2020). No appeal has been taken from the district court's order.

Brookland Manor Apartments and the Brentwood Village Shopping Center. It then approved the finer details of the project for the first phase of construction in the second-stage PUD order for Block 7. In so doing, the Commission took care to ensure that Mid-City's plans complied with the letter and spirit of the first-stage order and, in fact, clarified and augmented Mid-City's obligations to ensure that was the case. Although we are sympathetic to the concern that animates much of Ms. Elliot's appeal of this latter order—at bottom, a desire to keep her family and her community together—we are unpersuaded that the Commission's thorough assessment of Mid-City's plans according to the process set forth in the Zoning Regulations was materially deficient.

Accordingly, the Zoning Commission's order is hereby

*Affirmed*.